```
                  UNITED STATES DISTRICT COURT

                    DISTRICT OF CONNECTICUT

CARLY LUTES, KEVIN LUTES, AND   :
S.L., PPA KEVIN AND CARLY       :
LUTES                           :
                                :
v.                              :   CIV. NO. 3:10CV1549 (WWE)
                                :
KAWASAKI MOTORS CORP., USA      :
AND KAWASAKI MOTORS             :
MANUFACTURING CORP.             :
```

**RULING ON DEFENDANTS' MOTION TO PRECLUDE/LIMIT THE TESTIMONY OF PLAINTIFFS' EXPERTS TO MATTERS IDENTIFIED IN THEIR REPORTS [DOC. #186]**

Plaintiffs Carly and Kevin Lutes bring this products liability action against defendants Kawasaki Motors Corporation, USA (KMC), and Kawasaki Motors Manufacturing Corporation (KMM). It arises out of personal injuries plaintiffs sustained from an accident involving a Jet Ski manufactured by KMM and marketed and distributed by KMC. Pending before the Court is defendants' motion to limit the testimony of plaintiffs' experts to matters identified in their reports. [Doc. #186]. Plaintiffs' oppose defendants' motion [Doc. #195], to which defendants filed a reply [Doc. #199]. Upon careful consideration, defendants' motion to preclude is **DENIED**, as set forth below.

I.   Background

The claims in this action arise from the use of a "recessed hook"[1] on plaintiffs' Jet Ski. Specifically, plaintiffs Carly and

---

[1] The parties dispute the proper term for the device in question. Plaintiffs refer to the subject device as a "cleat." The owner's manual for the Jet Ski at issue refers to the device as a "recessed hook", while the Kawasaki parts system refers to it as a "cargo hook." For purposes of this ruling, the subject device will interchangeably be referred to as a "recessed hook" and "cleat", depending on the

Kevin Lutes were using their Jet Ski to tow an unmanned inner tube, which was attached by rope to the Jet Ski's recessed and tow hooks.  Plaintiff Carly Lutes was holding the excess rope when the recessed hook allegedly broke away from the Jet Ski, causing the tow rope to constrict around her arm, pulling her off the Jet Ski, and severing her left hand from her arm. Plaintiffs allege, <u>inter alia</u>, that the subject Jet Ski was defectively designed by using the recessed hook.

In support of their claims, on December 2, 2011, plaintiffs disclosed four liability experts, Christopher Barry, Michael Kalsher, Michael Sampsel and Thomas Eagar. The initial round of plaintiff's expert depositions has been completed. Defendants argue that these experts have offered testimony on matters not identified in their reports. Specifically, defendants seek to preclude plaintiffs' experts from referring to (if not mentioned in their reports) warranty claims, replacement parts rates, "other incidents", other standards, and other testing.

**II.  Legal Standard**

A testifying expert's Rule 26 report must contain a complete statement of "all opinions the witness will express" and the "basis and reasons for them," as well as the "facts or data" the expert considered in forming the opinions. Fed. R. Civ. P. 26(a)(2)(B)(i)-(ii). "The purpose of the expert disclosure rules is to avoid surprise or trial by ambush." <u>Harkabi v. SanDisk Corp.</u>, No. 08 Civ. 8203(WHP), 2012 WL 2574717, at *3 (S.D.N.Y. June 20, 2012)(citation and internal

---

experts' use of the terms in their respective reports.

2

quotation marks omitted). "An expert's trial testimony may be precluded based on nondisclosure only when it 'expound[s] a wholly new and complex approach designed to fill a significant and logical gap in the first [expert] report.'" Id. (quoting Cedar Petrochems., Inc. v. Dongbu Hannong Chem. Co., 769 F. Supp. 2d 269, 279 (S.D.N.Y. 2011) (brackets in original)). To that end, a court may permit challenged expert evidence so long as it is "within the bounds of the initial expert report." Harkabi, 2012 WL 2574717, at *3 (citation and internal quotation marks omitted). However, courts in this Circuit have held that, "an expert can offer 'evidentiary detail' at trial for opinions expressed in the expert's report." Harkabi, 2012 WL 2574717, at *3 (compiling cases). Accordingly,

> [S]ection 26(a)(2)(B) does not limit an expert's testimony simply to reading his report… The rule contemplates that the expert will supplement, elaborate upon, explain and subject himself to cross-examination upon his report. The purpose of an expert's report is not to replicate every word that the expert might say on the stand, but to convey the substance of the expert's opinion… so that the opponent will be ready to rebut, cross-examine, and to offer a competing expert.

Id. at *4 (internal citations and quotation marks omitted; brackets altered).

Moreover, even if there is not strict compliance with the disclosure requirements of Rule 26, "imposing the sanction of precluding expert testimony is not required" and "is a matter committed to the district court's discretion." Id. Preclusion of evidence is a "drastic remedy" and precluding expert testimony, even where there has not been strict compliance with Rule 26,

"may at times tend to frustrate the Federal Rules' overarching objective of doing substantial justice to litigants." Harkabi, 2012 WL 2574717, at *4 (citations omitted).

**III. Discussion**

   **A. Christopher Barry's Report**

Christopher Barry, P.E., is a naval architect, whose report is dated November 29, 2011. [Doc. #186-1, Ex. C]. He opines on the "failed cleat." Following a summary of his qualifications, previous testimony, and compensation, he lists the "data or information considered" in forming his expert opinion. [Id.]. Among the data and information considered are various standards and technical information, photographs of the broken cleat and cleat tests, International Organization of Standardization ISO 13590, and books on design, among others. [Doc. #186-1, Ex. C]. Mr. Barry then goes on to discuss his analysis of the strength of the cleat, engineering analysis of safety, engineering out the hazard, warnings, labels and manual, and stowage of slack line. [Id.]. Mr. Barry concludes,

> The 2008 Kawasaki FT-1500 Jet Ski™ is defective in that it does not meet the average (or even the expert) consumer's expectations for safety and is unreasonably dangerous: Very specifically, the cleat failed at a load well below established standards, and this unexpected failure, combined with no means to secure the remaining line, exposed the rider to an unreasonable, severe danger. This danger was not foreseeable by the owner or operator as they had no information or warning about the limited physical capacity of the cleat, but was readily foreseeable by the manufacturer who did have this information or had the capability to determine it.
>
> Kawasaki had numerous different opportunities to prevent the hazards that produced this accident including simple instructions in the manual. Some of them would be much less expensive than even the fitting they used on the craft, and one comprised not putting the fitting on at all.

4

> These defects related directly to the accident and the resulting injury to Carly Lutes.

[Doc. #186-1, Ex. C, 8]. Defendants seek an order precluding Mr. Barry from "testifying on replacement parts/rates, warranty claims (warranty logs), deposition transcripts, and ISO 15084." [Doc. #186, 8]. Plaintiffs respond that prior to Mr. Barry's deposition, defense counsel was provided with a CD containing Mr. Barry's file contents, which included defendants' responses to discovery encompassing replacements parts and "Summary of Case" binders, which included additional defense discovery responses, various standards including ISO 15084, warranty claims, and the reports/disclosures of plaintiff's liability experts, among others.

After a careful review of Mr. Barry's report, the Court, in its sound discretion, will not preclude his testimony concerning "replacement parts/rates, warranty claims (warranty logs), deposition transcripts, and ISO 15084." Even if these topics fall outside the bounds of Mr. Barry's initial expert report, the Court does not see the prejudice suffered by defendants in light of their having had the opportunity to depose Mr. Barry on these very topics. Moreover, plaintiffs recently disclosed their "supplemental and rebuttal expert" witnesses, which include Mr. Barry. [Doc. #213].[2] Defendants have until March 30, 2015 to complete Mr. Barry's deposition, at which time defendants may further inquire into the areas which they seek precluded. [Doc. #210]. Further, the Court notes District Court Judge Warren

---

[2] The disclosures also include Mr. Sampsel, and Drs. Kalsher and Eager as rebuttal experts.

Eginton's preference of determining matters on their merits such to afford "substantial justice to litigants." Therefore, defendants' motion as to Mr. Barry is DENIED.

## B. Michael Sampsel's Report

Michael Sampsel, also a naval architect, submitted an expert report dated November 30, 2011. [Doc. #186-1, Ex. E]. In his "discussion," Mr. Sampsel undertakes an analysis of applicable facts and other information including, for example, the number of replacement cleats sold and KMC's responses to plaintiff's interrogatories relating to the Coast Guard's design requirements. [Id.]. Following this discussion, Mr. Sampsel concludes, "The 2008 Kawasaki STX-15 Jet Ski side cleats are defectively designed in that they do not have sufficient strength to function as a universal attachment point as their appearance would suggest. Additionally, there is no convenient place to stow the tube or excess towline aboard the watercraft." [Doc. #186-1, Ex. E, 6]. Appended to the report is a list of 30 documents reviewed by Mr. Sampsel in forming his opinion.

Defendants seek an order precluding Mr. Sampsel from "testifying on replacement parts/rates, warranty claims (warranty logs), articles[,] standards[,] deposition transcripts, and the expert reports of Eagar and Simon Bellemare." [Doc. #186, 8]. Plaintiffs respond that Mr. Sampsel explicitly addresses warranty and replacement part information in his report. They also contend that prior to Mr. Sampsel's deposition, his file contents were emailed to defense counsel, which included defendants' responses to discovery encompassing

replacements parts, Mr. Sampsel's notes concerning other expert's depositions and warranty log inquiries.

After a careful review of Mr. Sampsel's report, the Court, in its sound discretion, will not preclude his testimony concerning "replacement parts/rates, warranty claims (warranty logs), articles[,] standards[,] deposition transcripts, and the expert reports of Eagar and Simon Bellmare," for the reasons stated with respect to Mr. Barry's report. The Court further notes that Mr. Sampsel's report explicitly discusses warranty replacements, warranty claims, and usage data concerning replacement rates. Accordingly, testimony concerning replacement parts/rates, warranty claims (warranty logs), appears to fall "within the bounds of [Mr. Sampsel's] initial expert report," Harkabi, 2012 WL 2574717, at *3, and therefore should not be precluded. Therefore, defendants' motion as to Mr. Sampsel is DENIED.

### C. Michael Kalsher Report

Dr. Michael Kalsher, Ph.D., is a psychologist, whose report is dated December 1, 2011. [Doc. #186-1, Ex. D]. Dr. Kalsher begins his report by listing the materials he considered in forming his opinion, including photos of the subject Jet Ski and its manual; various Kawasaki documents, including their responses to plaintiffs' first set of interrogatories; various standards; previous accidents; and the expert reports of Mr. Barry and Simon Bellemare. [Id.]. Dr. Kalsher notes that per plaintiffs' request, he focused attention "on the human factors issues (sic) in this case, and in particular on the adequacy of

7

the system of warnings for informing end users about the hazards of using the recessed cleats for purposes other than those intended by the manufacturer, including towing water tubes, with or without riders." [Id. at 2]. Following over four pages of findings, Dr. Kalsher concludes that,

> It is my opinion to a reasonable degree of professional probability that the warnings and instructions provided with the subject Jet Ski were defective as they relate to the need to inform users about the dangers of using the recessed hooks for towing. These materials fail to meet well-established human factors guidelines for designing and testing warning systems, in particular the guidelines promulgated by the American Boat & Yacht council (2002) and ANSI Z535 (1991; 1998; 2002; 2007), both of which were available at the time the subject Jet Ski was manufactured and sold. The hazard stemming from the use of the recessed hooks for towing manned or unmanned tubes was known or should have been known, to the manufacturer and this information should have been made available to end users. Had an appropriate warning been present in the defendant's system of warnings for the subject Jet Ski, it is more likely than not that the incident that caused Carly Lutes' injuries would not have happened.

[Doc. #186-1, Ex. D, 7].

Defendants seek an order precluding Dr. Kalsher from "testifying on replacement parts/rates, warranty claims (warranty logs), post-sale warnings, deposition transcripts and other material and topics (e.g., articles, other literature, doctrines, internet searches/sites, alleged submarining of the tube and its effect on steering, any ABYC standards and other standards and cost of compliance)." [Doc. #186, 8]. Plaintiffs respond, "[a]s with the other of Plaintiffs' liability experts, defense counsel was provided with a list of materials provided to Dr. Kalsher prior to his deposition, defense counsel was provided with any documents in Dr. Kalsher's file that the defense did not already have, and they were notified that Dr.

Kalsher had been provided with copies of the 'Summary of Case' binders." [Doc. #195, 9]. Plaintiffs further note portions of Dr. Kalsher's deposition testimony in which he testified that the materials he received to date were sufficient for him to come to the conclusions in his report, but that he preferred additional information, including more detailed information on the warranty claims. [Id. at 9-10]. He also testified concerning the importance of the warranty claims and replacement parts data to his opinions. [Id. at 10].

After a careful review of Dr. Kalsher's report, the Court, in its sound discretion, will not preclude his testimony concerning "replacement parts/rates, warranty claims (warranty logs), post-sale warnings, deposition transcripts and other material and topics," for the same reasons stated with respect to Mr. Barry's report. Moreover, the Court is not convinced that the testimony that defendants seek to preclude "expounds a wholly new and complex approach designed to fill a significant and logical gap in the first [expert] report." Harkabi, 2012 WL 2574717, at *3 (quoting Cedar Petrochems, 769 F. Supp. 2d at 279 (brackets in original)). Therefore, defendants' motion as to Dr. Kalsher is DENIED.

### D. Thomas Eager's Report

Thomas Eagar is a metallurgist, whose report is dated November 28, 2011. [Doc. #186-1, Ex. A]. Mr. Eagar also lists the documents he reviewed as part of his investigation, including photographs, Kawasaki brochures and documents, laboratory testing, warranty log inquiry, and defendants'

9

answers and responses to plaintiffs' first set of interrogatories and requests for production. [Id.]. The report notes that he was requested to "study the strength of the recessed hook and determine the cause of the failure." [Id.]. After listing his observations in eight numbered paragraphs, Mr. Eager concluded that,

> [T]he hook which broke causing the two rope tension to be transferred to Mrs. Lutes['] arm was due to use of a cast aluminum hook which had insufficient strength and ductility. This hook had the dimensions, and the surface finish appearance to suggest that it was a hook of sufficient strength to tow an empty inflatable raft. If it had been made of stainless steel or a wrought aluminum alloy of greater ductility, it would have supported approximately one ton of force which is more than would reasonably be expected from towing an empty tube. If the hook had not broken, the force of towing would not have been transferred to Ms. Lutes' arm and she would not have been injured.
>
> The measured strength of these hooks was similar to the strength which these hooks would have had if they had been made of plastic. However, these hooks were not made of plastic and were electroplated to appear as a durable metal hook. As a general rule, metals have ten times the strength of plastics. If this hook had looked like plastic, it is less likely that anyone would use it to secure a tow line. The Caution referred to above did not caution that the metallic hooks to which the Lutes' tow rope was attached was merely cosmetic and did not have sufficient strength to tow even empty tubes. The failed hook had the appearance of a strong durable point of attachment when in fact it was nothing more than a cosmetic ornament.  This design defect was compounded by the Caution label that warns and instructs about some attachment points but fails to comment on the hook that broke. Kawasaki failed to note that the hook that failed was ornamental and could not be trusted even for minor tasks. In essence, the incident hook was unsafe and was not fit for its foreseeable use. Its appearance gave a false sense of a secure attachment point, when in fact it was not. In this sense it was unreasonably dangerous.

[Doc. #186-1, Ex. A].

Defendants seek to preclude Dr. Eager from "testifying on replacement parts/rates and warranty claims (logs)." [Doc. #186, 8]. Plaintiffs respond that Dr. Eager's report indicates that he

reviewed defendants' discovery responses and warranty logs as of that time, and that he specifically referred to the replacement part data Kawasaki had produced as of that time. [Doc. #195, 10].

Again, after a careful review of Dr. Eager's report, the Court, in its sound discretion, will not preclude his testimony concerning "replacement parts/rates, warranty claims (warranty logs)," for the same reasons stated with respect to Mr. Barry's report. Moreover, as plaintiffs' correctly note, Dr. Eager's report specifically notes his review of a "Warranty Log Inquiry" and defendants' responses to certain discovery requests, which encompassed warranty claims. [Doc. #186-1, 3]. One of his observations further notes that, "In Kawasaki's Answers it was indicated that 1339 replacement hooks had been sold since August 2006." [Id. at 5]. Accordingly, similar to Mr. Sampsel's testimony, Dr. Eager's testimony concerning replacement parts/rates, and warranty claims (warranty logs) appears to fall "within the bounds of [his] initial expert report," Harkabi, 2012 WL 2574717, at *3, and therefore should not be precluded. Therefore, defendants' motion as to Dr. Eager is DENIED.

**IV. Conclusion**

Accordingly, for the reasons stated above, defendants' motion to limit the testimony of plaintiffs' experts to matters identified in their reports [Doc. #186] is **DENIED**.

This is not a Recommended Ruling. This is a discovery ruling or order which is reviewable pursuant to the "clearly erroneous" statutory standard of review. 28 U.S.C. §

636(b)(1)(A); Fed. R. Civ. P. 72(a); and D. Conn. L. Civ. R. 72.2. As such, it is an order of the Court unless reversed or modified by the district judge upon motion timely made.

SO ORDERED at Bridgeport this 25th day of March 2015.

```
     ___/s/_____
     HOLLY B. FITZSIMMONS
     UNITED STATES MAGISTRATE JUDGE
```