UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| CARLY LUTES, et al. ) | Civil Action No. 3:10CV01549-WWE |
| ) | |
| Plaintiffs, ) | DEFENDANTS REQUEST ORAL |
| ) | ARGUMENT |
| v. ) | |
| ) | June 23, 2015 |
| KAWASAKI MOTORS CORP., USA, ) | |
| et al. ) | |
| Defendants. ) | |
| ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO EXCLUDE EXPERT TESTIMONY OF THOMAS EAGAR**

**Overview:**

Eagar is a metallurgist. He performed two bench tests, using generic hardware store rope and a collection of dumbbells. By his own admission, he is not a "boat guy" and he is not a warnings expert.

He did not:

- Inspect the vessel, the rope, the tube or the broken hook.

- Inspect the scene.

- Interview any witnesses.

- Reconstruct the accident.

- Actually ride on this PWC or tow anything with any PWC to measure the forces or angles.

- Build or test any concept of a feasible safer alternative design.

6189592.1

**Eagar's Opinions Sought to be Excluded:**

- His two tests and any conclusions flowing from them. The tests were conducted:
    - With an incorrect rope;
    - Using a completely different size and style of knot;
    - With the hook not recessed and not attached to a fiberglass hull;
    - Bolted to a metal plate; and
    - Using pull angles that the accident reconstructionist (Bellemare) says are 100% wrong (or more).[1]

- From these tests he concludes that the hook (under those conditions) will fail at 300 lbs.;
- The cargo hook was not strong enough to tow an empty inner tube and it was not as strong as the line; and
- The only other opinion that he has is that the part is "A360" die-cast aluminum, which is not disputed.

**I.    FACTUAL BACKGROUND**

At the time Eagar prepared his November 2011 report in this case, he had no deposition testimony nor had he interviewed any witnesses. See Eagar Dep. at 13-14. Rather the factual support came from plaintiffs' counsel and the police report generated following the incident. In arriving at his opinions, Eagar broke two exemplar cargo hooks (given to him by plaintiffs' counsel) (Id. at 10), with photos of his test configurations appearing in the report of plaintiffs' other metallurgist expert (Bellemare). This is the only testing of the hooks by anyone on the plaintiffs' side of the case. Id. at 29.

---

[1] Bellemare says that the accident angle is 30° and Eagar tested at 15° and 75°. Hence, it is 100% wrong in the negative direction and over 200% wrong in the positive direction.

**Eagar's Test Configuration:**



See enlargement to the right

Dumbbell weights to simulate load

**The actual line and how it was tied/attached to the boat:**




**Eagar's Test Results**




**The Actual Results from the Accident:**




The reason why the results are different than reality is because unlike the actual event:

- He bolted the hook to a metal plate (not a fiberglass hull);

- He eliminated the "recess" (as can be seen above) by using a flat metal plate;

- The rope dimensions were different, the knot size and method was different and hence the "leverage" that the knot applies to the hook is different; and

- The angles he tested at were wrong (and additionally different from the angles/opinions of the plaintiffs' accident reconstructionist, Bellemare).

**Test Angles:**



**Overhead view of Jet Ski:**

Eagar conducted those two tests by simply hanging weights from a generic hardware store rope, not the nylon ski rope that was actually used. Id. at 10. He broke one hook at 15° and the other at 75°. Id. Eagar picked 15° because he was told by plaintiffs' counsel that was the angle at which the tube was being towed, and that was the angle he should test. Id. at 26-27. Eagar then selected 75° the 15° failure was not like the incident hook, so he figured, "it might have caused the boat to turn sideways 90 degrees . . . and I'll do 15 degrees from the back and 15

6189592.1                                                   - 5 -

degrees from the transverse." Id. at 27.  The tests were not conducted with the cargo hook mounted on a PWC nor were they performed with a mounting configuration that replicated the mounting of the cargo hook on a PWC.  Id. at 35-36.  Additionally, the rope configuration utilized in Eagar's testing did not reflect the tie-off arrangement described by Mr. Lutes.

In Eagar's tests, only a single strand of the rope was inserted through the body of the hook, whereas Mr. Lutes described doubling the line prior to inserting it into the cargo hook. See Kevin Lutes Dep. at 54, 56-57 (discussing Ex. 16 to the deposition), 60.[2]

In addition to using a different generic rope, Eagar's test set-up did not include the cargo hook mounting hardware (which creates a cavity behind the cargo hook).  This difference alters the manner in which stresses and strains within the hook and mounting structure are generated.  Even Eagar admitted that neither failure exactly replicated the actual failure in this case.  Eagar Dep. at 27-30[3].  The proof that Eagar's tests are not sufficiently

---

[2] This is the actual way the rope was tied off (except that it was not this cargo hook but the one just forward of this location).  The tow hook is the black object to the right in this photograph.

[3] "Q.  All right.  Then why did you fail one at 75 degrees?  A.  Because I did not get the failure in the threads like the incident hook" . . . Q.  . . . And the 15 degree failure was the one that you said was not like the -- obviously not like the failure in this case, right?  A.  It didn't fail in the stud.  It failed up above it.  Q.  Okay.  And so then that's when you then decided to test it at 75 degrees, right?  A.  Right, because I knew it had to be more of a sideways pull than 15 degrees.  Q.  Okay.  Exhibit Bellemare 13 (picture 17), is that the failure that you got at 75 degrees?  A.  Yes.  Q.  Okay.  Have you done any more testing of these hooks other than the two we talked about?  A.  No.  Those are the only two I had."

similar to the actual conditions is proven by the disparity of his results for the actual accident. (see photos above).

**Eagar's Opinions**

Eagar reached his opinions without reading any depositions. Id. at 13-14. He did not speak to the Lutes in preparing his report and did not inspect the craft or the actual rope used by the Lutes. Id. at 22-23. The only source of his information about the accident was from plaintiffs' attorney. Id. at 26-27. Eagar submitted a supplemental report on February 12, 2015, wherein he essentially states that his 2011 opinions (before a single deposition had been taken) remain the same. He has not performed any additional testing and his design opinions remain the same.[4]

His report has 8 numbered paragraphs followed by a few brief conclusions.

#1) He conducted two tests to break exemplar hooks at 15° and 75° and it broke at about 300 lbs.
#2) The subject hook broke in the threads.
#3) The material appears to be A360 aluminum.
#4) A360 has a yield strength and a tensile strength of 24,000 to 46,000 psi, but cast aluminum is weaker than wrought aluminum.
#5) There is a caution on the boat telling the operator to use the towing hook or the towing eyes for towing. He notes that there is "no caution" telling the operator that he cannot use the cargo hooks.
#6) The tube has a warning requiring a towing rope of at least 1,500 lbs.
#7) The hook is not strong enough to support 1,500 lbs.
#8) There were 1,339 replacement parts sold.

From these observations, Eagar expresses the opinions that:

a) the cargo hook "appears" to be strong enough to tow an empty tube;
b) if the hook had been stainless steel it could have supported "one ton";

---

[4] Eagar states in his 2/12/15 Supplemental Report that he has received and reviewed additional case materials, which "provide new information and new testing not available at the time of either my report of three years ago or my deposition of two years ago." Eagar did no additional work since his original report, other than review defense expert reports and discovery conducted. Nevertheless, he states that "this new information has not changed my opinion that the hook that failed resulting in Ms. Lutes' injury was defective as designed and by its design provided a false sense of security that the cargo hook was a secure attachment point." Id. at 1.

    c) therefore, Mrs. Lutes would not have fallen off;
    d) if the hook had looked like plastic, then it would not have been used for towing;
    e) these issues were "compounded" by the fact that there was no warning about not using it for towing; and
    f) the hook gave a "false sense of a secure attachment point". (See Eagar's 11/28/11 Report at 4)

Basically, the tests should be precluded because they do not represent the reality here.

The opinions on warnings (see *e* above)[5] and what the hook "looks like" (see *a, d,* and *f* above) should be excluded as set forth in the general Daubert motion. Opinion *c*, above, is an accident reconstruction opinion and Eagar admittedly did not perform an accident reconstruction. Opinion *b*, above, is not substantiated by any research he performed or any testing he conducted.

**Eagar's Lack of Qualifications**

Eagar, a metallurgist, recognized very early on about his lack of qualifications to testify in a PWC case. Shortly after being hired, Eagar told plaintiffs' counsel to "get a boat guy," "a naval architect type of expert," because he was not a boating expert. Eagar Dep. at 50. He has neither the background nor the experience to tell the jury whether the cargo hook "looks strong" or "gives the appearance" that it is strong. He has operated a PWC only once (not for this case), and that was several years ago. Id. at 41-42, 44. He does not know if there are any applicable standards for cargo hooks. Id. at 49-50. Despite having been deposed 200 or more times over a 35 year period, Eagar has testified in only one other PWC-related lawsuit, which involved corrosion on a part for the boat. Id. at 5-6, 45. He never actually saw the watercraft in question in that case, either. Id. at 45-47.

---

[5] Eagar admits that he is not a warnings expert. Eagar Dep. at 71, 78. He has never taken a course that had the word "warnings" in the title. Id. at 72-73.

**Eagar's Unreliable Testing**

Eagar's testing is not scientifically reliable or consistent with the facts of the case. Eagar admits that neither the 15° failure nor the 75° failure replicated the damage to the accident hook. Id. at 28-30. Neither test was performed in accordance with any scientifically reliable testing standard. Id. at 36-38. Eagar picked 15° because plaintiffs' counsel told him that was the angle at which the tube was being towed. Id. at 26-27.[6] He picked 75° because he did not get the failure in the threads like the incident hook, so he figured, "it might have caused the boat to turn sideways 90° . . . and I'll do 15° from the back and 15° from the transverse." Id. at 27 (i.e., 0° + 15° and 90° minus 15°, randomly chosen). For his testing, Eagar mounted the hook onto an aluminum plate. Id. at 35-36. He performed no tests using a fiberglass hull-like material. In real life, though, the subject cargo hook had a recessed portion to it, which was then recessed into the plastic of the hull. Id. at 36. Eagar did not test the hook with the recessed portion on it "because no one gave [him] a jet ski to test," and he "wasn't going to go out and buy a $10,000 jet ski just to do a test." Id. at 36. Eagar decided that the recessed portion was "just an insignificant detail." Id. at 36-37. He did not do any testing on the exemplar rope (he used a different brand rope than the one at issue), the hull of a PWC, or even attempt to test an actual PWC during a towing maneuver. Id. at 80, 90-92, 96-97. That was the sum total of Eagar's testing in this case.

Neither test by Eagar (at 15° or 75°) is consistent with either the 30° claimed by Bellemare or the 0° (floating behind the PWC) reported by the Mordans[7] and reflected in the real-world testing performed by defense expert Taylor. The break pattern on the exemplar hook

---

[6] Bellemare, who plaintiffs retained to reconstruct the accident, says that the angle is 30°. See Bellemare 11/29/11 Report at 4-5. Eagar did no testing at 30°. His closest test (15°) is "off" by 100% from the Bellemare number.

[7] See Barry Mordan Dep. at 16-17; Kathy Mordan Dep. at 23.

in Eagar's testing was different from the break pattern in the subject Lutes' hook.  In addition to testing at wrong angles and producing breaks that did not replicate the break in this case, Eagar used a different type of rope for his testing than the model the Lutes actually used.  Id. at 100-101.  The subject rope involved in plaintiffs' accident was found to have certain fraying in its strands, but there was no fraying to the rope as a result of Eagar's two tests.  Id. at 98-100, 101.



**Subject Rope frayed:**

He did not perform any experiments to determine the amount of load it would take for the hook to cause the damage found with the subject rope following the accident.  Id. at 96-97.  Although Eagar did not have the subject rope, he estimated a diameter for some hypothetical rope based on the photos taken after the accident and guessed 1,500 lbs. as the breaking strength of the rope.  Id. at 16.  Bellemare, who actually did inspect the actual rope, determined that its breaking strength was 2,375 lbs., resulting in the conclusion that Eagar was "off" by over 60%.  Id.

## II.   EAGAR'S OPINIONS MUST BE EXCLUDED.

Eagar fails all three Daubert inquiries:  (1) he is not qualified as an expert to testify in this PWC case; (2) his opinions are not based on reliable data and methodology; and (3) his testimony will not assist the trier of fact.  Basically, his tests were not scientific.  He admits that his test procedures are not authorized by any testing organization.  The tests are not a good "fit" for this case and there is nothing about them (other than an exemplar component of the cargo

hook was used) that replicates the reality of this case.  The "appearance" and warnings topics are outside of his metallurgy expertise.

### *Eagar is not qualified.*

Expert testimony must concern "scientific, technical, or other specialized knowledge." Fed. R. Evid. 702.  Testimony is properly characterized as "expert" only if it concerns matters that the average juror is not capable of understanding on his or her own.  See U.S. v. Amuso, 21 F.3d 1251, 1263 (2d Cir. 1994) ("A district court may commit manifest error by admitting expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject matter of the expert's testimony is not beyond the ken of the average juror.").

Eagar, a metallurgist, is not a qualified expert in this PWC case in which even he recognized early on telling plaintiffs' counsel (shortly after being retained) to "get a boat guy" because he was not a boating expert.  He has operated a PWC only once, years ago (not in this case).  Eagar does not know if there are any applicable standards for cargo hooks.  While he has been deposed more than 200 times, he has testified in only one other PWC-related lawsuit alleging corrosion of some part (which is not being alleged here).  Eagar is similarly unqualified to opine on the subject of warnings because he admittedly is not a warnings expert, does not hold himself out as a warnings expert, and has no training in behavioral psychology.  He has not taken a single course on the subject and his "entire scientific career following the scientific method"[8] does not pass muster under the mandated scrutiny requirements of Daubert.

---

[8] See Eagar Dep. at 72 ("Q.  What training do you have in evaluating warnings?  A.  In evaluating warnings you're looking at cause and effect, because this is the scientific method, and I've been doing the scientific method and learning about it since 1965 or so.  Q.  All right.  So my question was, what training or courses or education do you have in evaluating warnings? . . .  A.  I have my entire scientific career going back to 1965 in following the scientific method, and the -- in evaluating warnings, you're doing nothing more than looking at the scientific method of cause and effect and trying to determine if someone had been warned of something and had acted appropriately based on that warning, would have you gotten -- would you have gotten a different result.").

Eagar is not a "boater" and his lack of sophistication regarding boating matters, alone, would require that his opinions about "average boaters" (and how they would perceive things) be stricken.  See, e.g., Fernandez v. Cent. Mine Equip. Co., 670 F. Supp. 2d 178, 183–84 (E.D.N.Y. 2009) (finding expert in drilling accident case not qualified even though he had a bachelor's and master's degree in mechanical engineering, was employed with a forensic firm specializing in mechanical engineering, had taught courses in engineering, but had little expertise in geotechnical field, never operated any drilling rigs and never consulted for a drilling company); Quintanilla v. Komori Am. Corp., No. 04 CV 5227, 2007 WL 1309539 at *4 (E.D.N.Y. May 4, 2007) (precluding as not qualified, an engineer with no experience with printing presses or design of machine guards, even though he had experience in mechanical design for electronics); Barban v. Rheem Textile Sys., Inc., No. 01 Civ. 8475, 2005 WL 387660 at *3–4 (E.D.N.Y. Feb. 11, 2005) (holding that the expert was not qualified to testify as an expert regarding the design of a laundry press machine because he "has never designed a machine of any kind, and has never worked with laundry machines in any capacity that bears on the conclusions he reaches in this case").

### *Eagar's opinions are not reliable.*

Eagar's testimony is not grounded on sufficient facts or data, the hallmarks of reliable principles and methods, nor is there any indication that he applied those principles and methods reliably to *the facts of this case*.  Eagar has not seen the subject PWC or the actual rope and tube used by the Lutes on the day of the accident; Eagar's analysis of those products is based entirely on looking at photos (striking when you consider that the metallurgist expert is looking at fracture patterns from photos when the subject cargo hook is in the possession of plaintiffs' counsel).  When Eagar prepared his original November 2011 report in this case, he had not

talked to the plaintiffs and did not know what the plaintiffs were going to say about the accident (as they were not deposed until February 2012). In fact, he had no idea what any fact witness knew or said as they too had not been deposed until many months after his original report. Eagar never inspected the craft, essentially obtaining the "facts" instead from plaintiffs' counsel. He did not perform any experiments to determine the amount of load it would take for the hook to cause the damage found with the subject rope following the accident. Id. at 96-97. Even after reading the sworn testimony of plaintiffs and other experts years later, Eagar chose not to do any additional testing, but rather simply state that such information did not change his ultimate opinions reached in 2011.

The limited work he did do in this case was irrelevant, unreliable, and not consistent with the factual testimony. He conducted two tests by hanging weights from a generic rope (as opposed to the model rope the Lutes used to tow the tube) inserted through a cargo hook. His tests were not performed with a mounting configuration that replicated the mounting of the cargo hook on the PWC. Eagar's tests were not conducted with the cargo hook mounted on a PWC because "no one gave [him] a jet ski to test," and he "wasn't going to go out and buy a $10,000 jet ski just to do a test." Eagar dismissed the recessed portion as "just an insignificant detail."

Eagar loaded the exemplar hooks at angles of 15° and 75°, not because those are in accordance with any factual testimony, standards, other testing protocol, but because plaintiffs' counsel told him (incorrectly) that the tube was being towed at 15° at the time of the accident, and he picked 75° without any factual basis ("15° from the back and 15° from the transverse"). Neither angle replicated the factual testimony of any witness in this case. Moreover, the rope configuration Eagar used in his testing did not reflect the tie-off arrangement that Mr. Lutes

reported in his deposition. The fracture locations that resulted from Eagar's tests are different from those found on the subject cargo hook.

Plaintiffs have not demonstrated that the methodology that Eagar employed has been tested or subjected to peer review and publication, let alone generally accepted by the scientific community. Eagar's conclusions that the design of the cargo hook was defective and unreasonably dangerous are based on unreliable and flawed testing, cursory visual inspection, and guesswork. Eagar fails to identify what principles and methods he relies upon in coming to his conclusions regarding the warnings on the craft, besides his "entire scientific career . . . following the scientific method." Without any explanation of the reasoning, any calculations, or other type of scientific evidence supporting Eagar's conclusions, Eagar's testimony is connected to the evidence by his say-so only.

### *Eagar's opinions on the appearance of the cargo hook do not assist the jury.*

The requisite "fit" between Eagar's opinion testimony and the facts of this case is lacking. With no physical evidence or a single relevant test to support his theoretical speculations, Eagar cannot adequately explain how the methods he used support his opinions. The jury will be asked to bridge too broad an analytical gap, between Eagar's data (or, in this case, lack of it) and his conclusion of defect and causation.

Moreover, much of Eagar's testimony concerns material within the grasp of the average juror. He has neither the background nor the experience to tell the jury what the cargo hook looks like, whether it "looks strong" or "gives the appearance" that it is strong. Nor is he in any better position than the jury to comment on what the hook looks like. He does not get to usurp the jury's role on matters it is equally capable of understanding and resolving on its own.

Eagar's opinion that the rope is stronger than the hook in question hardly matters, since no one disputes that. Eagar's testimony does not assist the jury to decide any issue in this case.

### III. CONCLUSION

Eagar is not qualified to testify in this case. Furthermore, considering his reports and his deposition testimony, Eagar's testimony at trial would not be based on sufficient facts or data; would not be the product of reliable principles and methods and he has not applied the principles and methods reliably to the facts of the case. Therefore, for all of the above reasons, his testimony is not admissible and he should be excluded.

Respectfully submitted,

*/s/ Richard A. Mueller*
Richard A. Mueller (phv04283)
Carl J. Pesce (phv04284)
Thompson Coburn LLP
One US Bank Plaza
St. Louis, Missouri  63101
Telephone:  (314) 552-6000
Facsimile:  (314) 552-7000

Paul D. Williams (ct05244)
Day Pitney LLP
242 Trumbull Street
Hartford CT 06103-1212
Telephone:  (860) 275-0100
Facsimile:  (860) 275-0343

Attorneys for Defendants,
Kawasaki Motors Corp., U.S.A. and
Kawasaki Motors Manufacturing Corp., U.S.A.

CERTIFICATE OF SERVICE

      I hereby certify that on June 23, 2015, a copy of foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF system.

| | |
|---|---|
| Michael A. D'Amico<br>Brendan Faulkner<br>D'Amico, Griffin & Pettinicchi, L.L.C.<br>465 Straits Turnpike<br>P.O. Box 670<br>Watertown, CT 06795<br>mike@dgplaw.com<br>b.faulkner@dgplaw.com | Shelley L. Graves<br>Faulkner & Graves, PC<br>216 Broad St., PO Box 391<br>New London, CT 06320<br>slg@faulknergraves.com |

                                            */s/ Richard A. Mueller*