## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

*Electronically Filed*

| | | |
|---|---|---|
| CARLY LUTES, | ) | |
| KEVIN LUTES, and | ) | |
| S.L., PPA KEVIN and | ) | |
| CARLY LUTES | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No.3:10CV01549-WWE |
| | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| KAWASAKI MOTORS CORP., USA, | ) | |
| And KAWASAKI MOTORS | ) | |
| MANUFACTURING CORP., U.S.A. | ) | |
| | ) | |
| Defendants. | ) | AUGUST 11, 2015 |

## OPPOSITION TO MOTION TO EXCLUDE TESTIMONY OF THE METALLURGIST DISCLOSED AS AN EXPERT BY THE PLAINTIFFS, <u>THOMAS W. EAGAR, SC.D., P.E. [Document 226]</u>

Plaintiffs respectfully submit this Memorandum of Law in Opposition to the Kawasaki defendants' specific motion to exclude the testimony of Thomas W. Eagar, Sc.D., P.E. (*see* Doc. 226) and the general motion to exclude most of Plaintiffs' disclosed liability experts (*see* Doc. 224 and 225). Plaintiffs refer the Court's attention to and incorporate by reference the recently filed opposition to the defendants' motion for summary judgment (Doc. 237) and Rule 56(a)2 Statement (Doc. 238), the exhibits thereto, and the soon-to-be-filed objection to the defendants' general motion to exclude four of the experts disclosed by the Plaintiffs.

## I.     Dr. Eagar's Qualifications and Analysis of the Subject Cleat Failure

Dr. Eagar's experience and qualifications are set forth in his *curriculum vitae* (**Ex. A**). He earned a B.A. and a Sc.D.[1] in metallurgy from M.I.T.  He is a Professor of Materials Engineering and Engineering Management at Massachusetts Institute of Technology (M.I.T.) of which department he has also served as Chairman.[2]  Dr. Eagar's research involves materials manufacturing and engineering systems such as product design and development, materials systems analysis, selection of materials, and failure analysis.   He has extensive experience in failure analysis, materials testing and materials selection.  He has published more than 200 peer-reviewed articles, holds more than a dozen patents in the field of materials science, has received scores of honors and awards over the course of his career, and is a registered engineer.  He has taught at M.I.T. for more than 40 years. Following 9/11, Dr. Eagar was called on to explain the World Trade Center collapse to the M.I.T. Civil Engineering Department.

Here, Dr. Eagar has reviewed materials about what happened to Carly Lutes on Lake Augusta in Pennsylvania on August 31, 2008, Kawasaki discovery responses, testimony, and production materials, the Jet Ski Owner's Manual, testing and calculations performed by other experts disclosed in this case,[3] photographs, and information about other similar incidents.  He

---

[1] Doctor of Science (Latin: *Scientiæ Doctor*), usually abbreviated Sc.D. is an academic research doctoral degree awarded by research universities. The academic research Sc.D. is considered by both the United States Department of Education and the National Science Foundation to be equivalent to the Ph.D.

[2] He has been disclosed as an expert witness by the Plaintiffs here, given a deposition (**Ex. B**), and authored two (2) reports. **Exs. C** and **D**.  Photographs of his testing are attached as **Ex. E**.

[3] For instance, the defense experts have evaluated both the cargo retention capability of the Subject "Recessed Hooks" and the loads imparted by transporting and unmanned tube tethered to the Jet Ski.  *See i.e.* Defense expert Dale Alexander, Ph.D.'s report at p. 4: "ESI [the company that employs Dr. Alexander] also reviewed additional testing performed by DRE [other experts retained by the Kawasaki defendants here] to evaluate the loads imparted by an empty towable tethered from an exemplar model PWC during on-water riding conditions (DRE Report 2014-DRE-129PT).  Force was measured by a load cell attached inline of the towrope, with the end attached to the PWC tow hook and the towable tethered varying distances from the aft (rear) end of the PWC.  The results showed variations in force loading depending in large part on the orientation of the empty towable (…).  With the towable

has also performed proof load or dead-weight testing of exemplar Subject "Recessed Hooks."

Based on all of this, and applying his education, training, and experience he has analyzed the

failure of the cleat at issue here, reached certain conclusions about it, and has additional

knowledge in his area of expertise related to issues relevant to the jury's determinations.  For

example, Dr. Eagar will explain that:

- the subject cleat was made of a brittle aluminum alloy; materials such as this that experience brittle failure fail unpredictably, with low ductility prior to fracture, leaving relatively flat surfaces at the break;

- the Subject "Recessed Hook" made of this alloy was weaker than the rope bent to it the day of this incident based on his proof load testing;

- the strength of the cleat was insufficient for the foreseeable use of tying a rope to it (*i.e.* for docking or transporting an unmanned tube);

- proof load testing showed that the Subject "Recessed Hook" broke because the rope attached to it was stronger;

- that a loud popping sound such as described by the witnesses from the day of the incident is consistent with a brittle, tensile fracture of an alloy such as the die-cast aluminum alloy of which the cleat was made;[4]

- the number of replacement parts and the nature of the warranty claims for a part like this (*i.e.* without moving parts, that will not fail if used only as Kawasaki claims was the only intended use) is strong evidence of the defectiveness and should have been a red flag).

This testimony will be helpful to the jury and is sufficiently reliable under *Daubert* and its

progeny, as explained further below.

_____

upright, loads were well under 100 lbs., even at speeds exceeding 30 mph.  However, peak loads approaching and potentially exceeding 500 lbs. were measured."

[4] The subject "Recessed Hooks" were made of an aluminum-silicon alloy called AA360. Before Kawasaki disclosed the identity of the alloy during the course of this litigation, Dr. Eagar had reached this conclusion based on his own investigation of this failure.

The metallurgist disclosed by Kawasaki here stated on page 3 of his report: "…the subject recessed hook is an aluminum die casting with designation ACD3.  This Japanese alloy is equivalent to an A360.0 aluminum-silicon-magnesium alloy commonly used for die casting applications which has reasonable corrosion resistance suitable for use in marine environments."

II.     **Applicable Law**

Expert testimony is admissible under Fed. R. Evid. 702 when it is relevant and reliable. *Daubert v. Merrell-Dow Pharmaceuticals, Inc*., 509 U.S. 579, 589-90 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993).  "Under *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993), it is the district court that is charged with determining that expert testimony 'both rests on a reliable foundation and is relevant to the task at hand.' *Id*. at 597."  *United States v. Marji*, 158 F.3d 60, 62 (2d Cir.), cert. denied, 525 U.S. 1048, 119 S. Ct. 607, 142 L. Ed. 2d 547 (1998) (parallel citations omitted).  This so-called "gatekeeper" role of the trial court requires that judges make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93.  "The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Id*.at 595 (emphasis added); *see Kannankeril v. Terminix Int'l, Inc*., 128 F.3d 802, 809 (3d Cir. 1997) (holding that lack of peer review or publication was not dispositive where the expert's opinion was supported by "widely accepted scientific knowledge").

The Second Circuit has noted that the factors identified by the Supreme Court as relevant to the inquiry are: (1) whether the theory can be (and has been) tested according to the scientific method; (2) whether the theory or technique has been subjected to peer review and publication; (3) in the case of a particular scientific technique, the known or potential rate of error; and (4) whether the theory is generally accepted." *Zuchowicz v. United State*s, 140 F.3d 381, 386 (2d Cir. 1998) (quoting *Daubert* at 593-94).  Both the Second Circuit and the Supreme Court recognize "that these factors were not an exclusive or dispositive list of what should be considered, and that the trial court's inquiry should be a 'flexible one.'" *Id*. at 386-87 (quoting

Daubert at 594).  Likewise, _Daubert_ does not require re-inventing the wheel.  The Advisory

Committee Notes to Rule 702 also provide in part:

> An intelligent evaluation of facts is often difficult or impossible without the application of some scientific, technical, or other specialized knowledge. The most common source of this knowledge is the expert witness, although there are other techniques for supplying it.
>
> **Most of the literature assumes that experts testify only in the form of opinions. The assumption is logically unfounded. The rule accordingly recognizes that an <u>expert on the stand may give a dissertation or exposition of scientific or other principles relevant to the case,</u>** leaving the trier of fact to apply them to the facts. [   ]
>
> Whether the situation is a proper one for the use of expert testimony is to be determined on the basis of assisting the trier. "**There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.**" Ladd, Expert Testimony, 5 Vand.L.Rev. 414, 418 (1952).

Rule 702, Notes of Advisory Committee on Rules (emphasis added).[5]

A review of the case law after _Daubert_ shows that rejection of expert testimony is the

exception rather than the rule. See Fed. R. Evid. 702 advisory committee's note.[6]

---

[5] The Supreme Court has characterized the Committee Notes as a "respected source of scholarly commentary." _Tome v. United States_, 513 U.S. 150, 159 (1995).

[6] "A review of the case law after _Daubert_ shows that the rejection of expert testimony is the exception rather than the rule. _Daubert_ did not work a 'seachange over federal evidence law,' and 'the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.' _United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi,_ 80 F.3d 1074, 1078 (5th Cir. 1996). As the Court in _Daubert_ stated: 'Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.' 509 U.S. at 595. Likewise, this amendment is not intended to provide an excuse for an automatic challenge to the testimony of every expert. _See Kumho Tire Co. v. Carmichae_l, [143 L. Ed. 2d 238,] 119 S.Ct. 1167, 1176 (1999) (noting that the trial judge has the discretion "both to avoid unnecessary 'reliability' proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted, and to require appropriate proceedings in the less usual or more complex cases where cause for questioning the expert's reliability arises.").  Fed Rules Evid R 702 advisory committee note

### III.     Argument

**A. Dr. Eagar is Well Qualified to Provide Testimony on the Strength of the Cleat, the Significance of Replacement Part Data and Warranty Claims, and the Deceptiveness of the "Recessed Hooks."**

Kawasaki's claim (Defs.' Memo. Preclude Eagar, p. 15) that "Eagar is not qualified to testify in this case" rings hollow to say the least. He is more than sufficiently qualified to provide expert testimony on metallurgy, materials selection, and failure analysis. *See* p.1, *infra.*, and Ex. A.

Likewise, the claim that "Eagar's opinions on the appearance of the [Subject "Recessed Hook"] do not assist the jury" (Defs.' Memo. Preclude Eagar, pp. 14-15) is without merit.  One question in the case is whether it was reasonably foreseeable that a Jet Ski user would attach a line to the subject cleat for some purpose other than securing cargo on board (either by way of a cargo net not available from Kawasaki or "other suitable tie-down").  Another issue is what Kawasaki knew or should have known about affordances, cleats, their appearance, and how people use cleats.  In considering these questions, it will be helpful to the jury to learn that even someone with Dr. Eagar's vast experience with and knowledge of metals, alloys, and other materials thought the Subject "Recessed Hook" would be much stronger than it turns out to be. This will assist the jury, for instance, in considering that part of the alleged design defect is that the cleat is deceptive and an attractive nuisance.  It is especially helpful in light of the fact that part of the defense here is that they "never thought" anyone would consider this component a cleat because it is "obviously" an attachment for a cargo net only and it "looks like plastic."  Dr. Eagar will explain that it only "looks like plastic" when it is broken (following a brittle fracture). It looks quite strong when it is intact.

**B.  Dr. Eagar's Methodology is Sufficiently Reliable**

Dr. Eager's conclusions here are the result of accepted methodology employed by metallurgists and engineers who engage in failure analysis and materials selection.

As noted above, part of his work here involved dead-weight or proof load testing on two (2) exemplar "Recessed Hooks."  Proof load tests essentially apply loads to the structure gradually to a pre-specified level or until the structure displays signs of distress or fails.  Proof load testing has long been recognized to provide useful information about the capacity of structures to meet loading demands.[7]  This type of testing is frequently employed with respect to any number of engineered products from pipelines to bridges to fighter jets.  It is required by some parts of the federal regulations (*i.e.* OSHA regulations re: lifting / cranes, C.F.R. § 1919.71[8]).[9]  Thus, Kawasaki's claim that Dr. Eagar's failure analysis here including the proof load testing has not been tested, subjected to peer review, or been generally accepted by the scientific community (Defs.' Memo. Preclude Eagar, pp. 13-14) is not accurate.

With respect to experiments and testing, the Reference Manual on Scientific Evidence states:

---

[7] Dr. Eagar pointed out in his deposition that proof load tests have been around for thousands of years.  This is because they are valuable, cost-effective, and precise.  (There is no need to calibrate a known weight, such as a 50-lbs. or 25-lbs. weight.)  Tr. of Depo. of Dr. Eagar, p. 37, Ex. B.

[8] Section 1919.71 "Unit proof test and examination of cranes" provides in pertinent part:
(a) Unit proof tests of cranes shall be carried out at the following times:
(1)In the cases of new cranes, before initial use and every 4 years thereafter.
(2)In the cases of uncertificated cranes which have been in use, at the time of initial certification and every 4 years thereafter.
(3)After important alterations and renewals and after repairs due to failure of, or damage to major components.
(b) Unit proof load tests of cranes shall be carried out where applicable with the boom in the least stable direction relative to the mounting, based on the manufacturer's specifications.
(c) Unit proof load tests shall be based on the manufacturer's load ratings for the conditions of use and shall, except in the case of bridge type cranes utilizing a trolley, consist of application of a proof load of 10 percent in excess of the load ratings at maximum and minimum radii, and at such intermediate radii as the certificating authority may deem necessary in the circumstances…
(d) An examination shall be carried out in conjunction with each unit proof load test. The accredited person, or his authorized representative, shall make a determination as to correction of deficiencies found. …

[9] In other words, it is good enough for the government and industry, but not Kawasaki.

After performing inspections of the evidence, engineers develop hypotheses as to the cause of what they are investigating and evaluate these hypotheses. One common method of testing a hypothesis is experimentation, and **engineers are educated and trained to conduct experiments**, often to the displeasure of their client-attorneys who would rather not perform any test for which the outcome is uncertain. Engineers can design tests to study kinematics (motions) and kinetics (forces) and to recreate accidents; **to evaluate physical, mechanical, and chemical properties of materials**; or to assess specific characteristics against claims in a patent. Because the circumstances surrounding accident and product failure investigation can be quite complex, and often novel as well, engineers sometimes must design experiments that have never before been performed. This notion, experiments conducted for the first time for purposes of litigation, has been the topic of much debate. Although it is typically suggested that such work is biased and therefore ought to be excluded, **an experiment that is designed and executed for the purposes of litigation is not inherently suspect**. If the experiment has a **well-defined protocol that can be interpreted and duplicated by others, articulates underlying assumptions, uses instrumentation and equipment that is properly calibrated, and is demonstrated to be reliable and reproducible, it should not be summarily discarded** simply because it is new.  [  ]  Of course not all situations require novel techniques to be developed, and in those instances an abundance of standards for testing materials and products exist. Typically promulgated by organizations such as ASTM, ANSI, CEN, and others, these standards envelop everything from sample preparation, to sampling procedures, to test equipment operation and calibration, to analysis of data acquired during testing. Although such a broad array of standards and guidelines exist, it is possible that some portion of even the more novel test may not be covered. It is also common for engineers to follow a standard to the maximum extent allowed by the circumstances and state of the evidence, and to note deviations from that standard in their protocols and reports.

All of the bolded portions above apply to Dr. Eagar's work here.  He has extensive training, education, and experience about conducting experiments.  He designed an experiment here using a tried and true methodology that has been a part of engineering practice virtually since the beginning of engineering.  It was designed to evaluate the physical, mechanical, and chemical properties of the material (the Subject "Recessed Hook").  His proof load testing has a well-defined protocol that is easily interpreted and duplicated by others (mount a cleat, tie a line to it with a dead weight and drop the weight, increasing gradually until the cleat fails; record weight at which failure occurred), articulates its underlying assumptions (the component can

break at loads as low as the lowest dead weight drop that breaks it), and uses instrumentation and equipment that needs no calibration (known weights).[10]

**C. Dr. Eagar's Testimony about the Brittle Fracture of the Subject Cleat will be Helpful to the Jury, is Sufficiently Reliable, and Should not be Limited.**

A brittle fracture is a fracture of material occurring without appreciable prior plastic deformation—like breaking a glass.   It essentially involves a rapid run of cracks through a stressed material. The cracks typically move so quickly there is no indication the material is about to break.  In other words, there is very little plastic deformation before failure occurs.

In brittle fracture, the cracks run close to perpendicular to the applied stress. This perpendicular fracture leaves a relatively flat surface at the break.



[photograph of the cleat / Subject "Recessed Hook" that failed in the 8/31/08 incident at issue][11]

As shown, there was a relatively flat surface at the break, and little, if any, plastic deformation prior to break.[12]

---

[10] The fact that the fracture locations are different from the fracture location of the cleat that failed in the subject incident does not matter.  He was not trying to reconstruct the accident, nor is there any requirement that an expert perform a reconstruction.  The defense experts also broke several cleats with fracture locations different from the subject cleat.  Are all of those tests inadmissible too?

Likewise, Kawasaki criticizes the angles he used and the manner in which Dr. Eagar mounted the replacement part cleats he subjected to the dead-weight, proof load testing(Defs.' Memo. Preclude Eagar, p. 13-14), but glosses over the fact that the manner in which he mounted the component made it stronger, which, as Dr. Eagar noted as his deposition gives Kawasaki the benefit of the doubt.  See Tr. of Depo. of Dr. Eagar, pp. 86-88, Ex. B.  In any event, as noted previously, this is proper grounds for cross-examination, not a Daubert challenge.

[11] *See* Plaintiffs' Rule 56 Counter-Statement of Undisputed Facts (Pls.' CSUF) ¶¶2 - 7.

Dr. Eagar explained in his most recent report (2/12/15):

> The defendant's experts note that the fracture of Ms. Lutes' hook is flat [Alexander, p.2]. Flat fractures are usually associated with brittle material of little ductility. While the defense experts do not use the word brittle, neither do they claim that Ms. Lutes' hook exhibited significant ductility. Dr. Alexander [p.2] noted "No obvious localized permanent deformation was apparent at the break location." **A ductile metal bends before it breaks and absorbs considerable energy as compared to a brittle material. A brittle metal or material fails with little or no visible deformation absorbing very little energy in the process. An example of a very ductile material is rubber whereas the classic example of a brittle material is glass. Ductile failures occur at predictable loads, while brittle materials fail at unpredictable loads. Ms. Lutes' hook was a flat, brittle, unpredictable failure that exemplifies the unpredictable nature of fracture of brittle materials.**

Dr. Eagar 2//12/15 Report, ¶2, Ex. D[13]; *see* Tr. of Depo. of Dr. Eagar, p. 64 ("It was a brittle-type fracture … Many plastics will break in a brittle manner."), p. 59 (the Subject "Recessed Hooks" do not have high ductility).

When describing the results of his proof load testing of two (2) exemplar Subject "Recessed Hooks." Dr. Eagar also explained in his initial report (11/28/11):

> **The fact that both exemplars failed at 300 pounds suggests that this alloy fails in a brittle manner at low loads. This was confirmed by both exemplar fractures which displayed low ductility prior to fracture.**

Dr. Eagar 11/28/11 Report, ¶4, Defs.'Ex. 34; *see id.* p. 4 ("cast aluminum hook [ ] had insufficient … ductility.").

The classic example of ductile failure is a tensile test. In this fracture process, considerable elongation—deformation—takes place before the geometric instability, necking,

---

[12] *See* Report of Dale Alexander, Ph.D., P.E., p. 2 "The fracture surface appeared visually rough and relatively flat.), Defs.' Ex.33.

[13] *See Briley v. U.S. United Barge Line, LLC*, 2012 U.S. Dist. LEXIS 85377, *23-25 (W.D. Ky. June 20, 2012)(explaining as follows: the "ductility" of a metal is "the  property that enables solid substances, particularly metals, to undergo cold, visible, plastic deformation. The metal thus becomes permanently extended . . . with corresponding reduction in cross-sectional areas without actual fracturing or separation." C.R. Tottle, *An Encyclopedia of Metallurgy and Materials* 80 (Macdonald and Evans, 1984) [ ]; a "brittle fracture" is "the sudden and catastrophic failure of engineering components without prior plastic deformation." *Encyclopedia of Metallurgy*, p. 30; the term "plastic deformation" is "used in reference to the permanent (inelastic) distortion of metals under applied stresses which strain the material beyond its elastic limit. The deformation is accompanied by changes in the internal state of the metal, involving distortion of the crystal structure." *Encyclopedia of Metallurgy*, p. 230).

begins.  Even after the deformation is localized at the neck, significant deformation occurs at the neck before the fracture process begins.  By contrast, brittle fractures occur rapidly, without warning, and are catastrophic.

In the world of materials selection and failure analysis, ductile fractures are preferred to brittle fractures.  This is because ductile fractures are accompanied by significant deformation (which provides warning, time to react; and absorbs energy), whereas brittle fractures occur rapidly, with little or no deformation.

An example of the implications of "fast fracture" is the Boston Molasses Disaster nearly 100 years ago:

> Without an instant's warning the top [of a large molasses storage tank] was blown into the air and the sides were burst apart. A city building nearby, where employees were at lunch, collapsed burying a number of victims and a firehouse was crushed in by a section of the tank, killing and injuring a number of firemen.  On collapsing, a side of the tank was carried against one of the columns supporting the elevated structure [of the Boston Elevated Railway Co.] This column was completely sheared off…and forced back under the structure…. the track was pushed out of alignment and the superstructure dropped several feet … Twelve persons lost their lives either by drowning in molasses, smothering, or by wreckage. Forty more were injured. Many horses belonging to the paving department were drowned, and others had to be shot.

(Deformation and Fracture Mechanics of Engineering Materials, R. Hertzberg, et al. (4th ed.))[14] A modern engineering analysis first published last year concluded that the thickness of the steel walls was less than 50% of what it should have been even under the more relaxed standards of 1919, and (unbeknownst to the builders), the type of steel used for the tank was brittle, because it contained a low amount of manganese, making it more likely to crack.[15]

---

[14] The failure of the cleat resulting in Carly's hand and forearm being severed is another tragic and preventable example.

[15] Schworn, Peters (Jan. 15, 2015). "Nearly a century later, new insight into cause of Great Molasses Flood of 1919." Boston Globe. Retrieved August 10, 2015.  Likewise, the sinking of the Titanic in 1912 from

Importantly, as demonstrated by the post-incident testing by Dr. Eagar and the defense experts, brittle fractures also occur **_unpredictably_** (*i.e.* there are a fairly wide range of loads at which a brittle component will fail).[16]  This is demonstrated by the variable loads at which Dr. Eagar and the defense experts broke these cleats in testing.

Dr. Eagar's explanations of these facts will assist the jury here.

**D.**    **Dr. Eagar's Testimony about the Replacement Part Data and Warranty Claims will be Helpful to the Jury, is Sufficiently Reliable, and Should not be Limited.**

"Although most parts are designed with good intent to last for the design life of the part, **some factor or usage may not have been anticipated by the design engineer**.  Thus, part failure is occasionally experienced.  Some parts are not designed by an engineer, but are instead 'imagined' by a non-engineer without consideration of strength analysis or other usual engineering practices.  Whether designed or imagined, parts may fail in use because of a defect.  Such parts are usually introduced into the product manufacture and, therefore, appear in a number of products before failures take place and are recognized as a product defect.  At that point the part may be redesigned and substituted. …**Parts usage data obtained from the manufacturer can be analyzed for failure rates and therefore help confirm defective parts**."

Boat Accident Reconstruction and Litigation, Hickman and Sampsel, Lawyers & Judges Publishing Co., Inc. (3rd ed. 2011), p. 273

Here, Dr. Eagar has commented on the replacement part data in part as follows:

If the design load was 50 lbs. and I measured a six-fold safety factor of 300 lbs. and the defense experts measured well over a ten-fold safety factor, why were any hooks failing? With such huge safety factors, only a handful of hooks, if any, should fail, yet Kawasaki reports that there were over 2700 replacement hooks sold!  This was 1.59% of all hooks; but assuming only one hook failure per watercraft, there was a hook failure on over 6% of all units sold.  <u>This is an incredibly high failure rate for a part that is intended by</u>

---

an iceberg collision is widely reported to have been due to brittle fracture of the hull's steel plates.  *See* Cherepanov, G.P. (1979), <u>Mechanics of Brittle Fracture</u>, New York, McGraw-Hill International Book Co.

[16] Components that break in a brittle manner can break at loads lower than the theoretical strength of the material.

Kawasaki to be so lightly loaded.  Kawasaki should have known that these hooks were being used in a manner that Kawasaki had not anticipated.  There is some suggestion that these cargo hooks being more conveniently located than the towing hook were being used for mooring. Mooring could certainly produce loads similar to the loads experienced by towing the tethered tube. Hence Kawasaki should have reasonably foreseen that these cargo hooks might be used for mooring due to the convenient location. It would not have been difficult with over 2700 failures to perform a survey of how the hooks were being used when they failed.

It is both the percentage of watercraft affected (about 6%) and the sheer number of replacements (thousands) that is a concern.  There were 51 cargo nets replaced and over 2700 hooks replaced, hence there is a use other than cargo that Kawasaki should have investigated even if Kawasaki had not intended any use other than cargo.  Kawasaki should have known that there was something more than cargo involved in these replacements.

It is noted that the failure rate of this hook was eighth times the rate of the predecessor design hook. This was yet another indicator that should have alerted Kawasaki to a use other than cargo.

Dr. Eagar Report 2/12/15, ¶5 (emphasis added) (Ex. D).

    With respect to warranty claims Dr. Eagar has noted,

In the "Summary of Warranty Claim Documents Produced in Lutes v. Kawasaki" Claims No. 8, 9, 11, 15, 17, 18, 19, 20, 21 and 22 or nearly half, relate to broken hooks.  Again, with a safety factor of 6 to 10 in the Kawasaki design, this is evidence that the hooks were being used in a manner Kawasaki did not anticipate.

Dr. Eagar Report 2/12/15, ¶11  He is well qualified to provide this insight, whereas most ordinary jurors have never given any consideration to such issues, nor have they had any training, education, training or experience with post-market surveillance, defect detection, materials selection, or failure analysis.

>        **E.      Dr. Eagar's Testimony About the Subject Cleat Having Insufficient Strength for the Foreseeable Use of Attaching Lines will be Helpful to the Jury, is Sufficiently Reliable, and Should not be Limited.**

At his deposition, Dr. Eagar explained that he is "here to assist the jury with [his] metallurgical expertise and [ ] ability to do a failure analysis and the ability to design things as

[an] engineer[].”  Tr. of Depo. of Dr. Eagar, p. 20.  He explained his impression when he first

saw photographs of the fractured “recessed hook”:

> It was a brittle-type fracture. … Many plastics will break in a brittle manner.  A
> piece of steel will never break like this unless defective.  I didn’t know if this was
> aluminum.[17]  It looked like a piece of metal, and from looking at the fracture
> surface in the photo, I thought it was a piece of aluminum, and that’s why I asked
> to get some exemplars.

*Id.* pp.64-65.  “These look like hard points.  That’s the false sense of security,” Dr. Eagar

explained.  *Id.* p. 80.  He was asked about the comparative appearance of the “recessed hooks”

and the “towing hook,” and further explained:

> To me, as a metallurgist, they both look like they should support hundreds of
> pounds, not that one is good for hundreds of pounds and the other one’s good for
> 50 pounds.  In fact, if you ask me which one is stronger, you know, the recessed
> one looks just as good as the other because they’re similar in size and …the
> recessed hook has a metallic paint on it that looks like steel…..it’s painted to look
> like a piece of metal, and it is a piece of metal, it’s just a low-quality piece of
> metal….

*Id.* pp. 83-84

As noted, Dr. Eagar conducted proof load or dead-weight testing of the “hooks” and

found that they failed at 300 lbs. of force (+/- 5lbs.).  *See* Dr. Eagar Report 11/28/11, p. 2.  At his

deposition he explained how, then, the Subject “Recessed Hooks” are not strong enough for the

foreseeable use of attaching lines.  *See* Tr. of Depo. of Dr. Eagar, p. 21 (“It gave a false sense of

security by looking at it….”; “there was no need to make it this big or this expensive. There was

no need to paint it….”); p. 25 (“And it’s been painted so it would look like it would be strong.”)

In sum, Dr. Eagar has concluded:

---

[17] This was before Dr. Eagar had examined a fractured exemplar under the scanning electron microscope and before
Kawasaki had produced information as to the composition of the Subject “Recessed Hooks.”

The measured strength of these hooks was similar to the strength which these hooks would have had if they had been made of plastic. However, these hooks were not made of plastic and were electroplated to appear as a durable metal hook. As a general rule, metals have ten times the strength of plastics. If this hook had looked like plastic, it is less likely that anyone would use it to secure a tow line. The Caution referred to above did not caution that the metallic hooks to which the Lutes' tow rope was attached was merely cosmetic and did not have sufficient strength to tow even empty tubes. The failed hook had the appearance of a strong durable point of attachment when in fact it was nothing more than a cosmetic ornament. This design defect was compounded by the Caution label that warns and instructs about some attachment points but fails to comment on the hook that broke. Kawasaki failed to note that the hook that failed was ornamental and could not be trusted for even minor tasks. In essence, the incident hook was unsafe and was not fit for its foreseeable use. Its appearance gave a false sense of a secure attachment point, when in fact it was not. In this sense it was unreasonably dangerous.

Dr. Eagar Report 11/28/11, p. 4

He is perfectly qualified to provide these opinions. His methodology is sound. And Dr. Eagar's experience, knowledge, and conclusions on this topic will be helpful to the jury in that most ordinary jurors do not have any experience with metallurgy, materials selection, or failure analysis.

**F.    Kawasaki's Criticisms of Dr. Eagar's Testimony are not Well-Founded.**

As with the Kawasaki defendants' other motions to exclude, the motion directed to Dr. Eagar is nothing more than cross-examination clothed in *Daubert* language.

- Kawasaki complains that Eagar did not perform a reconstruction or ride the Jet Ski (Defs.' Mem., pp. 1, 8, 10) (Document 226)

Kawasaki appears to contend that Dr. Eagar should have ridden a Jet Ski (even though he is a materials engineering expert who will testify about the strength and other characteristics of the subject cleat), criticizes his lack of boating expertise,[18] and argues that he should have performed a reconstruction (there was no need).

---

[18] Would Stephen Hawking's testimony on cosmology be rejected because he hasn't flown on the space shuttle?

That Dr. Eagar did not perform the tests preferred by defendants is not a basis to exclude his opinions.  *See Pugh v. Louisville Ladder, Inc*., No. 08-2121, 361 Fed. Appx. 448, 2010 U.S. App. LEXIS 131, 2010 WL 55541, at *7 (4th Cir. Jan. 5, 2010) (expert's testimony admissible despite failure to analyze the likelihood of cracks forming in material used in product, and to definitively establish whether cracks predated accident where there was no evidence that testing actually performed by the expert was unreliable, and "the alleged failure of [plaintiffs] experts to perform additional testing goes more to the weight of the expert testimony than to its *Daubert* admissibility."); *see Clark v. Chrysler Corp*., 310 F.3d 461, 467 (6th Cir. 2002) ("*Daubert* does not require an expert to come in and actually perform tests in any given situation").

No boating expertise is needed for the scope of his testimony, and there was no need for him to ride the Jet Ski.

- Kawasaki quibbles over the angle of the rope at the moment the Subject "Recessed Hooks" failed (Defs.' Mem., pp. 9-10)

Kawasaki makes a mountain of a molehill in dissecting the question of the angle of the rope at the time the fake cleat failed.  We know that it failed.  The precise angle does not matter.

Dr. Eagar's dead-weight tests at 75 and 15 degrees gave him the information he needed. He stated that the degree range was the direction of real loading and "bracketed" the actual cleat failure.  **Tr. of Depo. of Eagar, pp. 29-30, Ex. B**.  He was not trying to recreate the failure from 8/31/08.  *Id*. at p. 30 ("I wasn't trying to replicate it.  I was trying to get a feel for the strength of the cleat itself.  There's no way to replicate it other than to look at the real one."); p. 149 ("it wasn't trying to reproduce exactly what happened, it was trying to ballpark what happened").

Furthermore, Dr. Eagar explained at his deposition that if you look at the photographs of the knot from the day of the incident "it doesn't match the cleat perfectly, and so no one knows exactly how that knot" contacted the actual cleat that failed.  Tr. of Depo. of Dr. Eagar, p. 31, Ex.

B.  He stated further: "So the actual angle of loading – because it depends on how the knot sets against the cleat.  Even if you're pulling at 30 degrees, the actual contact and breaking force could be at a slightly different angle…Which i[s] **why it's important to bracket what we have**, but no one can reproduce it exactly.  We have the actual incident one and we can deal with that." *Id*. at pp. 31-32 (emphasis added).[19]

Furthermore, the factual basis of an expert's opinion generally "goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis in cross-examination." *Bonner v. ISP Techs. Inc.*, 259 F.3d 924, 928 (8th Cir. 2001) (quoting *Hose v. Chicago Northwestern Transp. Co*., 70 F.3d 968, 974 (8th Cir. 1996)).  *Id.* at pp. 935-36; *see also Zuchowicz v. United States,* 140 F.3d 381, 387 (2d. Cir. 1998) ("[D]isputes as to the strength of his credentials, faults in his use of differential etiology as a methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility of his testimony.").

- Kawasaki criticizes Dr. Eagar for not being a "boating expert" (Defs.' Mem., pp. 8, 11-12, 14-15)

The fact that Dr. Eagar is admittedly not a boating expert is also no reason to limit his testimony (see bullet points at pp. 2-3 *infra*.).  Mr. Barry and Mr. Sampsel are boating experts.  Dr. Eagar has been disclosed as an expert in materials engineering, materials selection,

---

[19] *See id*. at pp. 34-35 ("And frankly, I wouldn't try to give you the exact angle because you're pulling a knot through a cleat at an XYZ angle, and the actual vector of force of the knot against the cleat is unknown and can only be known within a very broad range of angles, and I narrowed it down to between 15 and 75 degrees.").  He also explained how the defense theory that the failure occurred with the rope at a precisely 0 degree angle to the cleat is incompatible with the physical evidence.  *See id.*  at p. 41 and p. 86-88 ("…this is not pure shear because you're trying to pull a knot through a recessed cleat, and so you have a mixture of bending and shear and tension, and that's why my test was representative of trying to pull a knot through a recessed cleat at two different angles, and I got very consistent results, and there was no need to go and do further testing.  You can envision tests (his deposition was in November 2012) and I can imagine that your experts or Kawasaki might come back and say 'Oh, we did this test in the laboratory, and we found a much better strength.' Okay.  Are you now going to admit that your cleats that you sell as replacements, which is what I test, are defective? Is that what you're saying? Okay.  Anybody can devise a test that might optimize things.  I gave it the benefit of the doubt.  I mounted it to a nice hard plate [as opposed to an unsupported fiberglass hull] … that's the best condition, and it may only be 200 pounds or 300 pounds.  I agree. **The real point is it's less than 1500 pounds breaking strength of the rope.  That's what we're arguing about.**")

metallurgy, and failure analysis.  He has specialized information about the component at issue

here, which ordinary jurors do not have.   Kawasaki's harping on Dr. Eagar's boating experience

(Defs' Memo. Exclude Eagar, pp. 8, 11-12, 15) is silly, especially in light of his extensive

experience in materials selection and failure analysis for many different types of components and

given that Plaintiffs' have also disclosed two other engineers with extensive naval, marine, and

boating experience.  The citation to *Fernandez v. Cent. Mine Equip. Co*., 670 F. Supp. 2d 178

(E.D.N.Y. 2009) (Defs.' Memo. Exclude Dr. Eagar, p. 12) is not helpful.  There, the plaintiff was

required under New York law to show a feasible alternative design (which is not a requirement

under Connecticut law).  The plaintiff's expert opined that the device at issue should have been

equipped with a "rope guide," but the court concluded that the expert did not have sufficient

experience with such guards.  Notably, the court observed that an expert need <u>not</u> be precluded

"merely because he or she does not possess experience tailored to the precise product….that is

the subject matter of the dispute **as long as the expert has sufficient experience and**

**qualification so that the opinions are not speculative**." *Id*. at 184 (emphasis added).  Dr.

Eagar's testimony cannot be properly characterized as speculative.  Compare with *Humphrey v.*

*Diamant Boart. Inc*., 556 F. Supp. 2d at 176 (finding that although the expert had no experience

or education relating to the analysis of hand saws, he was qualified to render an opinion

regarding the guarding mechanism on a saw by virtue of his Bachelor's Degree and Master's

Degree in mechanical engineering and his Ph.D in Engineering Science, and his experience as an

engineering consultant, which included designing various items, including guards on a stationary

punch press and hand exerciser; "the expert's lack of experience with saws goes to the weight of

his testimony, not its admissibility"); *Peretz v. Home Depot, Inc.*, 08 CV 4106, 2009 U.S. Dist.

LEXIS 91048, 2009 WL 3124760, at *2-3 (E.D.N.Y. Sept. 29, 2009) (finding expert "to be

sufficiently qualified to offer his opinion as an expert, albeit barely" regarding the guard in a grinder, even though he had not studied mechanical engineering, had limited knowledge of standards and never designed a grinder).

In *Steinman v. Spinal Concepts, Inc*., 2011 U.S. Dist. LEXIS 107286, (W.D.N.Y. Sept. 22, 2011), a medical product device liability case the district court considered a similar defense argument as Kawasaki makes here with respect to "boating experience," in a similar context, and rejected it.

> Spinal Concepts does not dispute Parrington's qualifications regarding his expertise in materials engineering, rather it asserts that he is not qualified to present his opinion on this matter because he has no background in medical science.
>
> Parrington, however, does not purport to be an expert in medical device design. Rather, his testimony concentrates exclusively on reasons for the screws' fracture, and there is no dispute that this case revolves, almost entirely, around two broken screws. Parrington does not attempt to offer medical or biological opinions; instead he focuses on metal design and failure, his undisputed area of expertise as evidenced by his extensive education and experience in the field. (See Parrington Curriculum Vitae, Docket No. 70, Exhibit A.)
>
> Nor does an expert's knowledge about a particular subject need be precisely informed about all the details of the issue raised in order to offer an opinion. *Id.* (*citing Thomas J. Kline, Inc. v. Lorillard, Inc*., 878 F.2d 791, 799 (4th Cir. 1989)). **Simply because this device was used in the medical field does not mandate an added level of expertise. To do so would impose an overly narrow test and hamper Steinman's ability to present her case. More importantly, it would impede the function of Rule 702: "to assist the trier of fact in understanding scientific, technical or other specialized knowledge." Steinman, relying on his background, experience, and education, offers an explanation of the screws' failure that may assist the trier of fact**. Therefore, Spinal Concepts' motion is denied on this ground.
>
> Spinal Concepts also claims that Parrington's testimony is inadmissible because the method he used to estimate the number of cycles that the screws withstood before failure was unreliable. To reach his conclusion, Parrington counted the number of beach and ratchet marks on the screws' surface. (Parrington Declaration, ¶¶ 27-34.) He then examined the fatigue striations and calculated the distance between each striation to determine the number of the cycles from crack initiation to ultimate failure. This methodology is recognized by ASM International as a permissible measure of the cyclic loading necessary to cause the failure of a given material. ASM HANDBOOK, FAILURE ANALYSIS AND PREVENTION, 1066 (William T. Becker and Rosh J. Shirpley, eds. 2002). As such, Parrington based his conclusion on accepted and reasonable methodology. Further, only when there is "too great an analytical gap between the data and the opinion proffered should an expert's opinion be excluded." *Gen. Elec. Co., v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997). Here, Steinman has demonstrated

that Parrington's methods and the data he gathered were sufficiently connected to his conclusion.

Because Parrington is sufficiently qualified to offer an opinion on metallurgical failure, he limits his testimony to this field, his methodology is not unreliable, and the issue of metal failure is relevant, if not essential, to this litigation, Spinal Concepts' motion to exclude his testimony is denied.

*Id*. at *8-12 (emphasis added).

The same is true with respect to Dr. Eagar.  The fact that he is not a "boating expert" does not matter.  He is well qualified, his methodology is reliable, and the alloy's strength and conditions under which it fails when cast into the shape of the Subject "Recessed Hook" are relevant.  His testimony will be helpful to the jury.

Dr. Eagar's relying on his own testing and the plethora of photographs and documents concerning the cleat and what happened here as opposed to personally examining the Jet Ski itself again goes to the weight to be accorded his testimony, not its admissibility.  (See Defs.' Memo. Exclude Eagar, pp. 1-2, 7, 10, 12  "An expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. at 592 (citing Fed. R. Evid. 702, 703).  If an expert opinion is based upon facts or data "that the expert has been made aware of or personally observed," the opinion is admissible, even where the underlying facts and data are not, as long as "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Fed. R. Evid. 703.

**IV.    Conclusion**

In sum, Dr. Eagar has carried out a thorough, efficient, and scientific analysis of the cleat failure.  *See, e.g*., *Byrne v. Gracious Living Indus*., 2003 U.S. Dist. LEXIS 2552, *1 (S.D.N.Y. Feb. 25, 2003) (finding sufficient indicia of reliability in expert's background and the foundation for his opinions, despite a lack of empirical tests on the product that failed and no articulated

20

hypothesis about the cause of failure) (internal citation omitted); *see also Bruno v. Toyotomi U.S.A. Inc.*, 203 F.R.D. 77, 79 n.2 (N.D.N.Y. 2001) (noting that expert was qualified because he held at Ph.D. in the field, had 30-plus years of experience, had published over 100 technical papers and advised in numerous court cases).  Defendants' assertions concerning flaws in his qualifications and methodology are proper subjects for defendants' own expert testimony and for thorough cross-examination before the trier of fact.

For these reasons, Plaintiffs respectfully request that the Court deny the motions seeking exclusion of Dr. Eagar (Documents 224 and 226).  His testimony should not be limited.

Respectfully submitted,

By:/s/ Brendan Faulkner
Brendan Faulkner (ct19810)
Michael A. D'Amico (ct01442)
D'Amico, Griffin and Pettinicchi, LLC
465 Straits Turnpike
P.O. Box 670
Watertown, Connecticut  06795
(860) 945-6600
COUNSEL FOR PLAINTIFFS

**<u>CERTIFICATION</u>**

I hereby certify that on August 11, 2015, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

<u>/s/Brendan Faulkner</u>
Brendan Faulkner
D'AMICO, GRIFFIN & PETTINICCHI