## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

CARLY LUTES, KEVIN LUTES, and   :     CIVIL NO. 3:10-cv-01549 (WWE)
S.L., PPA KEVIN AND CARLY LUTES   :
                                       :
             Plaintiffs,   :
v.                                  :     **DFENDANTS REQUEST ORAL**
                                       :         **ARGUMENT**
KAWASAKI MOTORS CORP., U.S.A.   :
and KAWASAKI MOTORS   :
MANUFACTURING CORP., U.S.A.   :
                                       :
             Defendants.   :     SEPTEMBER 24, 2015

## REPLY IN SUPPORT OF DEFENDANTS'
## MOTION TO EXCLUDE EXPERT TESTIMONY OF THOMAS EAGAR

### *INTRODUCTION*

To arrive at his "conclusions," all Eagar really did was talk to the plaintiffs' lawyers and then break two cargo hooks using dumbbells and hardware store rope. He broke one at 15° and the other at 75°, when neither of these angles was a) the angle the tube was being towed at; b) the angle the hook broke at (according to Bellemare); and c) resulted in breaks that replicated the actual break that occurred in this case. Those two broken hooks are the entire foundation for Eagar's opinions[1]. In fact, Eagar did not: a) inspect the vessel, the rope, the tube, or the broken hook in question; b) inspect the scene; c) interview any witnesses; d) reconstruct the accident; e) operate the PWC or tow anything with any type of PWC to measure the forces or angles; or f) build or test any alternative design. Eagar was quick to point out to the plaintiffs that he is not a "boat guy" and that they should hire someone with more expertise in this area.

---

[1] Other than some items that are not actually being contested; such as that it was an aluminum caste metal.

Kawasaki moved to exclude Eagar's opinion testimony because his two broken hook tests[2] do not satisfy the requirements of Daubert, and the remainder of his proposed testimony[3] is either outside his area of expertise (as a metallurgist) or otherwise is inapplicable to a case where there is no alleged manufacturing defect.  Plaintiffs' response does not really attack any of these issues.  Instead, as with the other responses (Sampsel and Barry) they seek to explain what a smart and accomplished guy Eagar is and then discuss the many pages of materials that the Plaintiffs' counsel sent to him to review.  There is absolutely nothing in the Plaintiffs' brief that actually addresses the fatal flaws in his testing.

The flaws in Eagar's testing are understandable.  He was asked to perform testing before any of the factual witnesses were deposed in the case and, accordingly, it is not surprising that his testing is inappropriate for these facts.  No one asked him to "re-do" testing once he knew what the facts were and hence the testing remains inapplicable here.[4]

The issue here is NOT whether Eagar has a PhD.  The question is, when a PhD is hired and asked to perform tests without knowing what the facts are, and he performs tests that are (later) discovered to be irrelevant; are those tests admissible under Daubert.  The unequivocal answer is "no".  Time and again, courts have excluded well-credentialed experts on the ground that their methodology did not apply to the case or was not reliable.  If Daubert (and its

---

[2] The two hooks were broken after being bolted to a steal plate and, using hardware store rope, being tied up with a knot different than was used, and sequentially applying dumbbell weights at different angles (15° and 75°) neither of which meets the facts or the witnesses' testimony.

[3] Whether the aluminum cargo hook was defectively designed for use on a PWC (as opposed to whether a metal component failed); whether the warnings provided concerning use of the cargo hook were adequate; or whether that hook looked strong.

[4] The Plaintiffs' lawyer did respond to his request that they hire a real "boat guy".  Plaintiffs' counsel hired Sampsel, but then proceeded to request that he perform no real work here, other than just reading the depositions.

offspring) require anything, it is that the person offering scientific evidence must demonstrate that it is valid and scientifically reliable. Here, that proof is missing.

Eagar himself knew that the testing was flawed. He performed the first (15°) test and realized that the failure pattern was completely different from what occurred on the day of the accident. Hence, he arbitrarily selected another angle (75°) and again ended up with a failure that did not match the accident pattern. Plaintiffs do not address these points. These two hooks are the only ones he broke, because the Plaintiffs' lawyer only sent him two hooks to break. So, no more tests were performed. Plaintiffs do not seriously contend that these tests are applicable here. Instead, Plaintiffs' counsel embarks on a long discussion of what engineers "really do".[5] They also generically refer to "dead-weight" testing," which they claim has been "around for thousands of years." Opposition at 7, n.7. Generically, using dumbbells for lots of applications has been around for a long time. But when you use them with the wrong knot, the wrong angle, the wrong rope, the wrong backup plate and the wrong materials; that is where Daubert draws the line—regardless of whether the ancient Persians used dumbbells or not.[6]

Plaintiffs must demonstrate that Eagar's testing is scientifically sound and reliable. A conclusory assertion –like everybody does it--- does not meet this burden. Given that in his tests: a) the rope is wrong; b) the knot is different is size and shape; c) the hook was not applied to a recessed fiberglass hull, but rather a flat steel plate; and d) the angles that he applied neither

---

[5] They refer to such things as the Federal Judicial Center's Reference Manual on Scientific Evidence, not in support of whether what Eagar did *in this case* was scientifically reliable under the facts, but rather on what engineers do in the abstract.

[6] Of course, there is no reference in any of these materials to engineers using hardware store rope and dropping dumbbells on the fixture. In fact, the Plaintiffs do not dispute the fact that Eagar's test method cannot be found in any recognized standard or test criteria.

matched the plaintiffs experts or the witnesses—it seems clear that the results can be nothing but misleading to the jury.

This comparison chart demonstrates the disparity between the methodology of Eagar's two bench tests underlying his opinions and the actual facts of the case:

| Facts based on the testimony: | Eagar's testing:[7] |
|---|---|
| A rope that had 2,375 lb capacity; with a particular style and size of knot, and routed to pass twice through cargo hook. | A generic rope with an unknown load capacity; with a different style and size of knot, and routed once through cargo hook. |
|   *Exhibit 16 from C. Lutes deposition 2/7/2012.* |  *Image 1.2 from Bellemare report (29-Nov-2011) showing the generic rope and rope routed once through cargo hook.* |

---

[7] The Bellemare report photos were photos of Eagar's testing.  See Eagar Dep. at 27-28, 29, 38, 41, 89-90, 100 (discussing Eagar's testing based on images from Bellemare's report).

| | |
|---|---|
| A cargo hook with a recessed mounting plate.  *Taylor inspection photo 052 (7-September-2011) showing the opened recessed area* | A hook without a recessed mounting plate, which was bolted to a flat metal plate (as opposed to on a PWC fiberglass hull).  *Bellemare report 29-Nov-2011—bolted to a flat steel plate.* |
| Based on testimony: a tube being pulled, either at 0° (directly aft of PWC); or at 30° (testified to by Plaintiffs and their former accident reconstructionist expert, Bellemare).  *Taylor report 15-September-2014, Figure 23. Tube and tow-line orientation approximately 18 inches from craft.*  *Diagram demonstrating what 15° and 75° loading angles would look like.* | Measured at 15° and 75° using dumbbells as opposed to dynamic testing on water.  *Image from Bellemare report showing 75° load orientation.*  *Image from Bellemare report showing 15° load orientation.* |

| | |
|---|---|
| Subject cargo hook fracture in a single location; fracture in threaded portion of aft stud  *Taylor inspection photo 102 (7-September-2011)* | Exemplar cargo hook fracture pattern in Eagar 15° test.  Fracture in body of hook; no fracture in threaded portion of stud.  *Image from Bellemare report showing fracture characteristics during 15° load test.* |
| Subject cargo hook fracture in a single location; fracture in threaded portion of aft stud  *Taylor inspection photo 102 (7-September-2011)* | Exemplar cargo hook fracture pattern in Eagar 75° test.  Two fracture locations and fracture in the handle  *Image from Bellemare report showing fracture characteristics during 75° load test.* |

Ignoring all of these obvious differences, Plaintiffs instead regale us with tales of the

1919 Boston Molasses Disaster, without any explanation as to how any of this generic discussion

relates to this case.  Plaintiffs' Opposition reads more like a lecture on materials science, when

the one (and perhaps only) matter that is not in dispute here is the material composition of the

cargo hook (it is aluminum dye caste).  Apparently if you hire two materials science engineers

(Bellemare and Eagar) and it turns out that there is no issue in the case that involves the

materials, you drop one of them (Bellemare) and (as to the other –Eagar) you continue to talk about materials science.

### *ARGUMENT*

The basic point is that a) the tests are factually inapplicable here, b) scientifically unrecognized and unreliable, and c) produced results that stand in stark contrast to what everyone knows happened here.

**Factually inapplicable.**

The fact remains that Eagar's methodology was not (and since he did not know any of the facts) could not have been applicable here.  Unlike what actually occurred, Eagar (1) bolted the hook to a flat metal plate (not a recessed fiberglass hull); (2) used hardware store rope (as opposed to the 3,000 lb nylon maritime rope used by the Planks); and (3) tested the wrong angles of forces from the tube to the PWC.  This is not "quibbling;"[8]  but rather distinctions that affected the result.  Eagar (who did not actually know what the facts were) conducted a test that provided stresses and strains that were completely different from the real event.  Note that when Taylor actually tested it on a boat, the results were almost 300% different from Eagar "dumbbell test."  See Robert Taylor 09/15/2014 at 34.  Even Eagar admitted that neither of his failures replicated the actual failure in this case.  Eagar Dep. at 27-30.  The striking contrast between Eagar's testing results and the actual accident demonstrates the unreliability of his testing.[9]

---

[8] Opposition at 16.  Plaintiffs argue that "[w]e know that it failed.  The precise angle does not matter." Apparently, to the Plaintiffs, the type of failure does not matter either. Sadly for the Plaintiffs, that is not the law. If an expert ignores the facts of the case in performing an experiment and then claims, nonetheless, that the experiment proves the defect, it is unreliable because they expert did not bring the same level of rigor to his case work as he would do in his own profession. See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999).

[9] Noticeably, Taylor's on boat testing, at the correct angle, did produce failures that replicated the actual event.

Plaintiffs try to bury these fundamental mistakes in a footnote; bringing out the well-worn "it goes to weight" argument.  <u>See</u> Opposition at 9 n.10.  Plaintiffs attempt to brush off the glaring inconsistent failure results with an unsupported "brittle materials" are "unpredictable" contention—when even Eagar agreed that the results were dissimilar.  After all, that is entirely why he ran the 75° test.  All of this smoke and mirrors is not a substitute for the scientific process.  One does not hear the physicists at the Hadron Collider trying to explain away their results by talking about the "unpredictability" of science.

Plaintiffs ask the Court to ignore Eagar's unreliable testing in this case because "dead-weight" testing has "been around for thousands of years".  Opposition at 7.  A lot of types of testing have been around for years, but that does not make it applicable here, nor reliable when applied to these facts.  Moreover, it is not the "dead weight" part of the test that is inappropriate here.  Using the wrong plate, the wrong knot, the wrong rope and the wrong angle (not to mention getting the wrong result) are what make it misleading, false and unreliable.

Plaintiffs' worn-out "goes to weight" argument has been specifically rejected in the Second Circuit.  <u>See</u> <u>Amorgianos v. Nat'l R.R. Passenger Corp.</u>, 303 F.3d 256, 268-69 (2d Cir. 2002) ("[the plaintiffs] contend that the defects, if any, with respect to their proffered expert testimony went to its weight, not its admissibility.  We disagree.") (affirming exclusion of the plaintiffs' experts for being fatally flawed and not based on science and reliable methodology).[10]

---

[10] <u>See also</u> <u>Ruggiero v. Warner-Lambert Co.</u>, 424 F.3d 249, 254-55 (2d Cir. 2005) (rejecting the plaintiff's argument that any fault in his expert's methodology went to the weight, not admissibility. and affirming exclusion of expert testimony as insufficiently reliable); <u>Boucher v. U.S. Suzuki Motor Corp.</u>, 73 F.3d 18, 22 (2d Cir. 1996) (rejecting the plaintiff's argument that his prospect for full-time employment was a factual matter for the jury to determine, not a basis for excluding his expert's estimate of his future earning capacity, and observing that "the Federal Rules of Evidence require a greater degree of discrimination than that, [and] we must resist 'the temptation to answer objections to receipt of expert testimony with the shorthand remark that the jury will give it the weight it deserves'"). .

Plaintiffs' suggested approach to Daubert would eviscerate the "rigorous examination" required

by Amorgianos:

> I reject Plaintiffs' argument, frequently made by proponents of
> expert testimony, that any imperfections go to weight, not
> admissibility, and are for the jury to evaluate following cross-
> examination.  If I were to accept that argument in this case, I
> would be required to beat my gatekeeper's sword into a
> ploughshare.

Gary Price Studios, Inc. v. Randolph Rose Collection, Inc., No. 03-969, 2006 WL 1319543, at *8
(S.D.N.Y. May 11, 2006).

The whole purpose of Daubert (et al.) it to make sure that the jury is only "weighing"

scientifically reliable evidence.  So before the jury gets to "weigh it" the court must decide if it

passes muster.  The reason Daubert used the phrase "gatekeeping function" was so that

unreliable evidence would not be allowed to go to the jury.  The gatekeeping function requires

the trial court to conduct an exacting analysis of the foundations of Eagar's opinions to ensure

they meet the standards for admissibility under Rule 702.

After sifting through all of the arguments and inappropriate citations, the Plaintiffs are

left with just Eagar's say-so to support this work.  Ipse dixit, however, is not immune from

Daubert scrutiny.[11]  See Pappas v. Sony Electronics, Inc., 136 F. Supp. 2d 413, 422 (W.D. Pa.

2000) ("Daubert is a hurdle that experts must surmount.  And, before the gates to the courtroom

will be opened . . ., a proposed expert must do more than simply say 'let me in (because I say

---

[11] As the Supreme Court has noted in this context:

> Conclusion and methodology are not entirely distinct from one another. Trained experts
> commonly extrapolate from existing data. But nothing in either Daubert or the Federal Rules of
> Evidence requires a district court to admit opinion evidence which is connected to existing data
> only by the ipse dixit of the expert. A court may conclude that there is simply too great an
> analytical gap between the data and the opinion proffered.

Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).

so).'") (Excluding the plaintiffs' expert because "the only evidence in this case to validate [the expert's] method is [the expert's] own claim that his method is reliable[,] [and] [s]uch evidence is insufficient to overcome even the most basic requirements of Rule 702.").

**Eagar is not a boating expert and his metallurgical education is not relevant here.**

In discussing Eagar's qualifications, Plaintiffs never directly address his admission that he is not "a boat guy," "a naval architect type of expert." Eagar Dep. at 50. Eagar has also disavowed expertise on the topic of warnings. Id. at 78. Eagar also lacks the relevant background and experience to tell the jury in a boating case whether the cargo hook on a watercraft "looks strong" or "gives the appearance" that it is strong. As explained in Kawasaki's Daubert motion, jurors do not need a metallurgist to tell them what the hook "looks like." Kawasaki's Daubert Motion (Doc. 224) at 14.

Plaintiffs wrongly assume that an expert qualified in one subject matter thereby becomes an expert for all purposes. Rule 702 prohibits testimony on subject matter unrelated to the witness's area of expertise. See Kumho Tire Co. v. Carmichael, 526 U.S. 137, 149 (1999) (for expert testimony to be admissible, it must have "a reliable basis in the knowledge and experience of the relevant discipline."). That is because to qualify as an expert, the witness must have experience with the issue before the court. See Diviero v. Uniroyal Goodrich Tire Co., 919 F. Supp. 1353, 1357 (D. Ariz. 1996), aff'd, 114 F.3d 851 (9th Cir. 1997) ("Expertise in the technology of fruit is not sufficient when analyzing the science of apples. The courts have excluded the testimony of engineers because their expertise was not particular to the science involved in the case."). If this had been a case where the cargo hook failed due to it being a "bad casting" his background would have been relevant. But he evaluated that and rejected that issue. It is not a bad casting and there is no manufacturing defect. Hence, his skills are no longer

relevant to the case.  No one disputes that it is a good casting.  No one disputes that it is dye cast aluminum.[12]  Plaintiffs have now conceded (in response to Kawasaki's motion for summary judgment) that there is no manufacturing defect claim here.  The only claims here are design defect and warnings.  Eagar is an expert in neither.  In fact, he admitted he is not a warnings expert and plaintiffs have hired someone else (Michael Kalsher) to handle those issues.

At the beginning of the case the plaintiffs might have worried that there was a metallurgical issue here—but there is not.  Hence, Eagar should be excluded.[13]  See Weisgram v. Marley Co., 169 F.3d 514, 520–21 (8th Cir. 1999) (affirming the exclusion of a metallurgist's design defect opinion because he had no personal experience and "no metallurgic reason for his conclusion" that the high limit control mechanism in the allegedly defective baseboard heater failed, "because, of course, that is not a metallurgic issue."); Krueger v. Johnson and Johnson Professional, Inc., 66 Fed. Appx. 661, 662 (8th Cir. 2003) (holding, in a product liability action against manufacturer of medical device, that exclusion of metallurgist's expert testimony regarding defective design was not an abuse of discretion where metallurgist had insufficient knowledge or experience with the design of the device or similar systems to adequately explain or validate their theories).

---

[12] See, e.g., Arnold v. Amada America, Inc., No. 4:07cv198, 2008 WL 3411789, *4-5 (E.D. Mo. 2008) (excluding the plaintiff's expert, who "[was] an impressive researcher, academic, and engineer[;] [with] . . . fields of interest [in] dynamics, vibration, aeroelasticity, applied aerodynamics and helicopters[,]" but "those credentials [were] not sufficient to make him an expert on the design of press brake machines."); Shaffer v. Amada America, Inc., 335 F. Supp. 2d 992, 995-96 (E.D. Mo. 2003) (excluding testimony of expert who had doctorate in mechanical engineering and taught courses such as mechanical engineering, design, and biomechanics at university for 20 years because the engineer had virtually no experience with press brakes, the allegedly defective product at issue).

[13] That Eagar "designed an experiment to evaluate the physical, mechanical, and chemical properties" of the hook is immaterial.  This is a design defect case, not a manufacturing defect case.

**The new proposed list of topics for Eagar are not ones helpful to the jury.**

Plaintiffs list six items and argue that Eagar's testimony on those topics will be helpful to the jury.  Opposition at 3.  Not so.

"Unpredictable brittle failure"—This is new.  Eagar never once mentioned the word "unpredictable" in his November 2011 report nor did he mention it in his deposition.  This is basically his effort to justify his incorrect testing results.  Basically, he would like to explain his aberrant test results by referring to the unpredictable scientific method due to this being a "brittle material".  Of course, none of this will explain why Taylor had no problems whatsoever duplicating the failure result.  Either way, if the tests are excluded (as they should be) his justification for the bad result should also be excluded.

Eagar's new "unpredictability" theory belies his own earlier opinions and analysis.  Taylor's 04/22/2015 Report at 13-15.  In his original report, Eagar presented calculations to "predict" what the failure loads should be for a pure tensile load on the (unthreaded) stud portion in tension.  In his original report and his deposition testimony, Eagar determined that the failure load was approximately 300 pounds at both angles of 15 *and* 75 degrees.  In his 02/12/2015 rebuttal report, Eagar invokes the "unpredictability" concept for the first time to explain why his physical tests resulted in failure loads that are inconsistent with the laboratory testing conducted by defense experts.  The experimental results obtained during defense testing demonstrated that the fracture characteristics were repeatable and fracture loads were consistent within a given range, roughly 10-15%.  Id.  If it is so unpredictable, why did Eagar perform the tests in the first place? The "unpredictability" theory is basically his effort to justify his inaccurate results.  Contrary to Eagar's assertions, the fracture pattern was very predictable for all defense testing

with a zero degree loading angle, and those tests were consistent with the fracture pattern observed on the subject hook.  Id.

"Hook weaker than the rope"—there is no dispute that the rope (rated for 2,375 pounds of load capacity) was stronger than the cargo hook, which (as discussed in the Owner's Manual) was only intended to be used with 50 pounds of cargo.  Given that Eagar admits that he is not a boater, having him offer boat design criteria like this is completely unsubstantiated and inadmissible.

"Foreseeable use"— Same answer here.  Eagar is a self-admitted non-boater[14]. Testimony from him as to the foreseeable uses of a boat component would be complete error. Despite having been deposed 200 or more times over a 35 year period, Eagar has testified in only one other PWC-related lawsuit, which involved corrosion on a part for the boat.  Id. at 5-6, 45. He never actually saw the watercraft in question in that case, either.  Id. at 45-47.  Furthermore, since Eagar is not a human factors expert, he may not opine on whether it was foreseeable that someone would try to put a tow line through the cargo hook.  That is the province of a human factors expert, which Eagar is not one.  A witness, who readily admits that he is not a "boating guy," should not be permitted to offer opinions as to what an ordinary reasonable boater would use a component for on a watercraft.  In addition to not being experienced on this point, Eagar is offering no scientific reliability as to this opinion (which is the foundation of admissible expert testimony).  Moreover, the jury is equally qualified as Eagar to determine "foreseeable use."

---

[14] Eagar Dep. at 50 ("I recommended [to Plaintiffs' counsel], back when I first got this case, that they get someone who was a naval architect or boating expert because, I've already explained to you, I'm not a boating expert, okay?"). He has operated a PWC only one time (not for this case), and that was several years ago.  Id. at 41-42, 44. He does not know if there are any applicable standards for cargo hooks.  Id. at 49-50.

"Proof load testing"— This simply refers to the two dumbbell tests, which should be excluded.  See chart and discussion above.

"Loud popping sound as evidence of brittle, tensile fracture"—Eagar first mentioned "loud popping" in his deposition, as part of the testimony of Mr. Lutes that he is relying on for his opinions in this case.  See Eagar Dep. at 134-35.  No doubt there are a wide variety of sounds that would fall under the rubric of "loud popping".  The eyewitnesses believed that the sound was more like that of a breaking bone.  Eagar was not there and his speculation that it was one kind of "popping sound" versus another is simply the lowest form of pure guesswork.  Even in the tests that Eagar performed he did not break a hook that was actually attached to a PWC.  He has never heard a cargo hook, bolted to a PWC break.  This is undocumented, baseless conjecture.  Finally, as Kawasaki's counsel pointed out at the Eagar deposition, Mrs. Lutes heard no popping sound—so if the sound he wants to opine about was so "clear" then she should have heard it.  See Eagar Dep. at 136.[15]

"Replacement parts and warranty claims"—This is not a metallurgical opinion.  This is lawyer argument.  Absent some proof that the replacement parts were broken or the warranty claims related to towing, none of this is remotely relevant here.  Moreover, Eagar is parroting Sampsel on this point, which is not proper.[16]  See, e.g., Town of Wolfeboro v. Wright-Pierce, Inc., No. 12-cv-130, 2014 WL 1806843, *2 (D.N.H. April 2, 2014) (expert may not "parrot[] the

---

[15] "Q. She didn't hear a loud pop, right? A. I don't know. Was she asked that?  I don't remember if she was asked that. Q. She was. And you read her deposition, I take it. A. I did read her deposition, but the fact that someone who is going through something as traumatic as this doesn't remember every detail is not surprising at all.").  See also Carly Lutes Dep. at 135 ("Q. All right. And do you have -- I mean, I realize that you probably, either from talking to your lawyers or the experts that you've hired and so on, you've come to the conclusion that the cleat broke. But is there anything that you saw or experienced that day that you now can say, Yes, I heard a popping sound, that must have been the cleat breaking, or I – you know, it was right by me knee, I could feel that, or something? A. No. I didn't know why I was being pulled off.").

[16] See Opposition at 12 (citing a book on boat accident reconstruction co-authored by Sampsel).

conclusions of other experts' reports in his report[;] those are not his opinions based on facts or data appropriately relied on in his field."); <u>Dura Automotive Systems of Indiana, Inc. v. CTS Corp.</u>, 285 F.3d 609, 614 (7th Cir. 2002) ("A scientist . . . is not permitted to be the mouthpiece of a scientist in a different specialty.  That would not be responsible science.").

**Closing arguments are not the same as admissible expert testimony.**

Plaintiffs' Opposition, at times, reads like Plaintiffs' lawyer's closing argument (without any evidentiary support) as opposed to admissible expert testimony.[17]  Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments.  <u>See</u> 4 Weinstein's Federal Evidence § 702.03[2] [a].

**Plaintiffs rely on inapposite case law.**

Quoting at length excerpts from <u>Steinman v. Spinal Concepts, Inc.</u>, No. 05-cv-774s, 2011 WL 4442836 (W.D.N.Y. 2011), Plaintiffs argue that Eagar need not be a "boating expert" to testify in this case.  Opposition at 19-20.  <u>Steinman</u> involved an allegedly defective device consisting of a plate and four screws that was surgically implanted in the plaintiff's spine. <u>Steinman</u> is distinguishable.  The plaintiff in that case sought to hold the defendant strictly liable for design *and manufacture* of the medical device.  Because <u>Steinman</u> revolved entirely around two broken screws, the expert focused on metal design and failure and examined the metallurgical properties of the screws to determine their stress threshold.  Here, by contrast, there is no manufacturing defect claim, and the case hinges on an aluminum hook, so there is no metallurgical issue in play.  As such, <u>Steinman</u> is not applicable to the question the jury here will

---

[17] <u>See</u>, <u>e.g.</u>, Opposition at 9 (discussing brittle fractures); 11 (discussing how ductile fractures are preferred to brittle fractures "[i]n the world of materials selection and failure analysis").

be asked to decide – whether the design of the cargo hook was defective or whether the warnings provided with the craft were inadequate.

## CONCLUSION

Eagar's opinion testimony should be excluded in its entirety.

Respectfully submitted,

_/s/ Richard A. Mueller_
Richard A. Mueller (phv04283)
Carl J. Pesce (phv04284)
Thompson Coburn LLP
One US Bank Plaza
St. Louis, Missouri  63101
Telephone:  (314) 552-6000
Facsimile:  (314) 552-7000

Paul D. Williams (ct05244)
Andraya B. Pulaski (ct29715)
Day Pitney LLP
242 Trumbull Street
Hartford CT 06103-1212
Telephone:  (860) 275-0100
Facsimile:  (860) 275-0343

Attorneys for Defendants,
Kawasaki Motors Corp., U.S.A. and
Kawasaki Motors Manufacturing Corp., U.S.A.

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that on September 24, 2015, a copy of foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF system.

Michael A. D'Amico
Brendan Faulkner
D'Amico, Griffin & Pettinicchi, L.L.C.
465 Straits Turnpike
P.O. Box 670
Watertown, CT 06795
mike@dgplaw.com
b.faulkner@dgplaw.com

Shelley L. Graves
Faulkner & Graves, PC
216 Broad St., PO Box 391
New London, CT 06320
slg@faulknergraves.com


                                              */s/ Richard A. Mueller*